## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

|  |  |  |
|---|---|---|
| INSURANCE MARKETING COALITION LIMITED | ) ) ) |  |
|  | ) |  |
| *Petitioner*, | ) |  |
|  | ) |  |
| v. | ) | No. _____ |
|  | ) |  |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | ) ) ) |  |
|  | ) |  |
| *Respondents*. | ) ) |  |

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(b), 28 U.S.C. §§ 2342(1) and 2344, 5 U.S.C. § 706, and Rule 15(a) of the Federal Rules of Appellate Procedure, the Insurance Marketing Coalition Limited ("IMC") hereby petitions this Court for review of an order of the Federal Communications Commission titled Second Report and Order, *In the Matter of Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC CG Docket Nos. 21-402, 02-178, 17-59 ("*Order*"). The *Order*, a copy of which is attached to this Petition, was released by the Commission on December 18, 2023, and will be

published in the Federal Register at a later date. Venue is proper under 28 U.S.C. § 2343, because IMC's principal office is in the Eleventh Circuit.

The time to file a petition for review from an order of the Commission under the Hobbs Act is "within 60 days after its entry." 28 U.S.C. § 2344. Courts have traditionally interpreted "entry" to mean publication in the Federal Register. *See W. Union Tel. Co. v. FCC*, 773 F.2d 375, 378–80 (D.C. Cir. 1985) (Scalia, J.); *Verizon v. FCC*, 2011 WL 1235523 (D.C. Cir. Apr. 4, 2011) (unpublished); *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 287–91 (3d Cir. 2007). However, a recent D.C. Circuit decision has created uncertainty regarding when an agency action is final for purposes of judicial review and thus whether the *Order* was "entered" for Hobbs Act purposes upon publication by the Commission. *See Humane Society v. Dep't of Agric.*, 41 F.4th 564, 571 (D.C. Cir. 2022); *GPA Midstream Ass'n v. U.S. Dep't of Transp.*, 67 F.4th 1188, 1195 (D.C. Cir. 2023). IMC is filing this protective petition for review now out of an abundance of caution and will file a second petition for review upon publication of the *Order* in the Federal Register.

IMC seeks review on the grounds that the *Order* is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; is in excess of statutory jurisdiction, authority, or limitations; and was adopted without observance of procedure required by law. *See* 5 U.S.C. § 706(2). IMC requests that this Court hold unlawful, vacate, enjoin, and set aside the *Order*.

2

Respectfully Submitted,

/s/ Kevin King
Yaron Dori
Kevin King
   *Counsel of Record*
Matthew J. Glover
John A. Boeglin
Sameer Aggarwal
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5488
kking@cov.com

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

December 21, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

|  |  |  |
|---|---|---|
| INSURANCE MARKETING COALITION LIMITED | ) ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | No. _____ |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | ) ) ) ) | |
| *Respondents*. | ) ) ) | |

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Petitioner Insurance Marketing Coalition Limited ("IMC"), certifies that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of IMC's stock, and other identifiable legal entities related to a party, known to IMC:

1. Aggarwal, Sameer, associate, Covington & Burling LLP, counsel for Petitioner;

2.  Boeglin, John A., associate, Covington & Burling LLP, counsel for Petitioner;

3.  Covington & Burling LLP, counsel for Petitioner;

4.  Dori, Yaron, partner, Covington & Burling LLP, counsel for Petitioner;

5.  Federal Communications Commission, Respondent;

6.  Glover, Matthew J., special counsel, Covington & Burling LLP, counsel for Petitioner;

7.  Insurance Marketing Coalition Limited, Petitioner;

8.  King, Kevin F., partner, Covington & Burling LLP, counsel for Petitioner;

9.  United States of America, Respondent.

Pursuant to Circuit Rule 26.1-3(b), Counsel further certifies that, to the best of Counsel's knowledge, no publicly traded company or corporation has an interest in the outcome of the case or appeal.  Counsel will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-4.

/s/ *Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

December 21, 2023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

|  |  |  |
|---|---|---|
| INSURANCE MARKETING COALITION LIMITED | ) ) ) | |
| *Petitioner*, | ) ) ) | |
| v. | ) ) | No. _____ |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | ) ) ) ) | |
| *Respondents*. | ) ) ) | |

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Petitioner Insurance Marketing Coalition Limited ("IMC"), certifies that IMC is a tax-exempt corporation incorporated in Delaware and has its principal place of business in Florida.  IMC is an association that advocates on behalf of insurance industry stakeholders.  IMC members interact with consumers to provide information, education, and meaningful choices related to their insurance coverage options.  Counsel further certifies that IMC is not a publicly traded company or corporation, has no parent company or corporation, and no publicly held company or corporation owns 10 percent or more of IMC stock.

/s/ *Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

December 21, 2023

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| INSURANCE MARKETING COALITION LIMITED | ) )  ) ) |
| *Petitioner*, | ) ) |
| v. | )  No. _____ |
| | ) |
| FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA | ) ) ) |
| | ) |
| *Respondents*. | ) ) ) |

### CERTIFICATE OF SERVICE

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that on this 21st day of December, 2023, I caused copies of the foregoing Petition for Review, Certificate of Interested Persons, and Corporate Disclosure Statement to be served upon the parties listed below by United States first-class mail, postage prepaid, and by electronic mail (as indicated by asterisk), in the manner prescribed by 28 U.S.C. § 2112(a) and 47 C.F.R. § 1.13:

1

**Federal Communications Commission**
P. Michele Ellison*
General Counsel
Federal Communications Commission
45 L Street NE
Washington, DC 20554
LitigationNotice@fcc.gov

**United States of America**
Merrick B. Garland
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

/s/ *Kevin King*
Kevin King

*Counsel for Petitioner*
*Insurance Marketing Coalition Ltd.*

December 21, 2023

# ATTACHMENT

Federal Communications Commission                                    FCC 23-107

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Targeting and Eliminating Unlawful Text Messages | ) | CG Docket No. 21-402 |
| | ) | |
| Rules and Regulations Implementing the | ) | CG Docket No. 02-278 |
| Telephone Consumer Protection Act of 1991 | ) | |
| | ) | |
| Advanced Methods to Target and Eliminate | ) | CG Docket No. 17-59 |
| Unlawful Robocalls | ) | |
| | ) | |
| | ) | |
| | ) | |

**SECOND REPORT AND ORDER,**
**SECOND FURTHER NOTICE OF PROPOSED RULEMAKING IN CG DOCKET NOS. 02-278**
**AND 21-402, AND WAIVER ORDER IN CG DOCKET NO. 17-59**

**Adopted:  December 13, 2023**                      **Released:  December 18, 2023**

**Comment Date:  [30 days after Federal Register publication]**
**Reply Date:  [45 days after Federal Register publication]**

By the Commission:  Chairwoman Rosenworcel and Commissioners Starks and Gomez issuing separate statements; Commissioner Simington approve in part, dissent in part and issuing a separate statement.

**TABLE OF CONTENTS**

Heading                                                                    Paragraph #

I.  INTRODUCTION ................................................................................................................1
II.  BACKGROUND ................................................................................................................5
    A.  The Commission's Multi-Pronged Approach to Unwanted and Illegal Calls ................7
    B.  Combating Unwanted and Illegal Texts ........................................................................12
III. SECOND REPORT AND ORDER....................................................................................14
    A.  Mandatory Blocking Following Commission Notification ...........................................16
    B.  National Do-Not-Call Registry .....................................................................................26
    C.  Email-to-Text Messages ...............................................................................................29
    D.  Closing the Lead Generator Loophole ..........................................................................30
    E.  Text Message Authentication and Spoofing ..................................................................54
    F.  Summary of Benefits and Costs ....................................................................................56
    G.  Legal Authority ............................................................................................................62
IV. SECOND FURTHER NOTICE OF PROPOSED RULEMAKING ....................................67
    A.  Text Blocking................................................................................................................68
        1.  Expanding the Mandatory Text Blocking Requirement to Originating Providers and

        Adding a Downstream Provider Blocking Requirement ........................................................69
   2.  Requiring Blocking of Texts Based on Reasonable Analytics ..............................................75
   3.  Alternative Approaches .........................................................................................................79
   4.  Protections Against Erroneous Blocking ..............................................................................80
  B.  Text Message Authentication ......................................................................................................81
  C.  Traceback .....................................................................................................................................84
  D.  E-Mail-To-Text Messages ...........................................................................................................86
  E.  Further Efforts to Assist Small Businesses with Compliance ......................................................87
  F.  Benefits and Costs .......................................................................................................................88
  G.  Digital Equity and Inclusion .......................................................................................................89
  H.  Legal Authority ...........................................................................................................................90
V.  WAIVER ORDER ...............................................................................................................................93
VI. PROCEDURAL MATTERS ..............................................................................................................97
VII. ORDERING CLAUSES ...................................................................................................................108
Appendix A List of Commenters
Appendix B Final Rules
Appendix C Proposed Rules
Appendix D Final Regulatory Flexibility Analysis
Appendix E Initial Regulatory Flexibility Analysis

# I.    INTRODUCTION

    1.  Consumers increasingly rely on text messaging to stay in touch with friends and family, to do business, communicate with their child's school, and get information from their government. On many devices, people immediately see some or all of the messages once received on the device, whereas they have the option to ignore unwanted calls. This causes consumers to open their texts quickly because texts are an expected trusted source of communications, not annoyance and scams.[1] The rise of junk texts jeopardizes consumer trust in text messaging. The increase of unwanted and illegal texts[2] also frustrate consumers, and scam texts can cause serious harm. Scam texts can contain links to phishing campaigns and load malware onto unsuspecting consumers' phones, leading to fraud and other harms.[3] The Federal Trade Commission (FTC) reports that text messaging scams cost

---

[1] *See* CTIA, Messaging, https://www.ctia.org/homepage/messaging-channel ("The text messaging platform is one of the most trusted forms of communication because consumers have choice and control over their text message experience.") (last visited Oct. 26, 2023); CTIA, Protecting Yourself from Spam Messages, https://www.ctia.org/consumer-resources/protecting-yourself-from-spam-text-messages ("Overall, text messaging is one of the most trusted and widely used forms of communication by consumers. In fact, Americans send over 63,600 text messages per second.") (last visited Oct. 26, 2023).

[2] The rules we adopt today focus on stopping illegal calls or texts, which in many cases also are unwanted. A call or text may be illegal for a number of reasons, including those that violate the Telephone Consumer Protection Act (TCPA) or Do-Not-Call (DNC) protections.

[3] SMS phishing, or smishing, is the practice of sending text messages to someone in order to trick the person into revealing personal or confidential information which can then be used for criminal purposes. Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/smishing (last visited Nov. 3, 2023).

**Federal Communications Commission**                    **FCC 23-107**

consumers $86 million in 2020 and $326 million in 2022.[4]  Other estimates show higher losses, e.g., over $20 billion in 2022.[5]

2.     We take action today to stop this trend and ensure consumers can continue to trust text messaging.  We do so by building on our recent text blocking requirements.  First, we require terminating mobile wireless providers[6] to block text messages[7] from a particular number following notification from the Commission unless their investigation determines that the identified text messages are not illegal.  Next, we codify that the National DNC Registry's protections apply to text messages.  Third, we encourage providers to make email-to-text, a major source of illegal texts, a service that consumers proactively opt into.  Next, we close the lead generator loophole by prohibiting lead generators, texters, and callers from using a single consumer consent to inundate consumers with unwanted texts and calls when consumers visit comparison shopping websites.

3.     And we propose further steps to stop illegal texts.  First, we propose a stronger blocking requirement following Commission notification and seek comment on other options for requiring providers to block unwanted or illegal texts.  Second, we seek further comment on text message authentication, including the status of any industry standards in development.  Finally, we propose to require, rather than simply encourage, providers to make email-to-text services opt in.

4.We also adopt a limited waiver to allow providers to use the Reassigned Numbers Database (RND) to determine whether a number that the Commission has ordered to be blocked has been permanently disconnected.  This waiver will help prevent blocking of lawful texts from a new subscriber to the number.

## II.     BACKGROUND

5.     While combating unwanted and illegal calls has long been one of the Commission's top consumer protection priorities, combating unwanted and illegal text messages is a comparatively new

---

[4] FTC, Consumer Sentinel Network Data Book 2020 at 12 (2021), https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2020/csn_annual_data_book_2020.pdf (2020 Consumer Sentinel Data Book); FTC, Consumer Sentinel Network Data Book 2022 at 12 (2023), https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Data-Book-2022.pdf (2022 Consumer Sentinel Data Book).  *See also* FTC, Consumer Sentinel Network Data Book 2021 at 12, https://www.ftc.gov/reports/consumer-sentinel-network-data-book-2021 (2022) (2021 Consumer Sentinel Data Book).  As the Joint Consumer Commenters observe, the FTC data are based solely on reports made by consumers and represent only a fraction of the universe of losses from text scams; the actual losses to consumers from text-initiated frauds are, undoubtedly, exponentially greater.  Joint Consumer Commenters at 3.

[5] Robokiller, The Robokiller Phone Scam Report: 2022 Insights & Analysis, at 4 (2023), https://assets.website-files.com/61f9a8793a878d7f71c5505d/6400e06e514500224ad26830_The%20Robokiller%20phone%20scam%20report%20-%202022%20insights%20%26%20analysis.pdf (Robokiller 2022 Report).  Robokiller observes that, in 2022, 225.7 billion spam texts were sent, a 157% increase from 2021's then-record 87.8 billion. *Id.* at 5.  Robokiller estimates the loss to robotext scams at $13 billion, for the first half of 2023, a $4 billion increase from the first half of 2022. Robokiller, The Robokiller Phone Scam Report:  2023 Midyear Insights & Analysis, at 4 (2023), https://assets.website-files.com/61f9a8793a878d7f71c5505d/64ca6ccf1f5e962fae3e55e3_Robokiller%20Mid-Year%20Report%202023.pdf (Robokiller 2023 Report).

[6] In this order, we use "provider" to mean a mobile wireless provider that provides text messaging services.  Where we refer to providers of voice calls, we use the term "voice service provider," which may include originating, intermediate, or terminating voice service providers.

[7] We use the definition of text message in section 64.1600(o) of our rules in this proceeding.  The scope of our decision regarding text messages is limited to those originating from North American Numbering Plan (NANP) numbers that use the wireless networks, e.g., SMS and MMS, not over-the-top (OTT) messaging, such as iMessage and WhatsApp, or Rich Communications Services (RCS); 47 CFR § 64.1600(o) *et seq.*

focus.[8]  Just like unwanted and illegal calls, unwanted and illegal texts defraud and harass consumers.  Robokiller estimates that these texts increased by over 300% between 2020 and 2022.[9]  These texts can result in real financial loss to consumers.[10]

6.    Robocalls and robotexts can both annoy and defraud consumers, but robotexts can be particularly pernicious.  Robotexts are delivered directly to consumers phones and can include links to phishing websites that look identical to legitimate websites, easily tricking potential victims into providing personal or financial information.[11]  Or, the link itself may be the threat.[12]  Simply clicking on a scam link could load malware onto phones that provides opportunities for theft of passwords, personally identifiable information, and other credentials, without consumer consent or knowledge.[13]

### A.    The Commission's Multi-Pronged Approach to Unwanted and Illegal Calls

7.    Unwanted and illegal texts reach the same consumers and may even come from the same sources as unwanted and illegal calls.  Our long-standing work on robocalls thus informs our new work on robotexts.

8.    *Telephone Consumer Protection Act and National Do-Not-Call Registry*.  The TCPA and the Commission's implementing rules require callers to obtain consumer consent for certain calls and texts sent using an automatic telephone dialing system (autodialer) or made using a prerecorded or artificial voice.[14]  If a robocall or robotext includes or introduces an advertisement or constitutes telemarketing, the prior express consent must be in writing.[15]  The Commission has clarified that

---

[8] Since 2003, the Commission has interpreted "call" in section 227(b)(1)(A) of the Communications Act of 1934, as amended (Act or Communications Act) to include both voice calls and text messages.  This order distinguishes "calls" (voice) from "texts" for purposes of our blocking and other actions today even though they are both "calls" under the statute.

[9] Robokiller 2022 Report at 4.  Robokiller observes that, in 2022, fraudsters sent 225.7 billion spam texts, a 157% increase from 2021's then-record 87.8 billion.  *Id.* at 5.  According to Robokiller, Americans received 78 billion robotexts in the first half of 2023, an increase of 18% from the first half of 2022.  Robokiller 2023 Report at 4.

[10] *See, e.g.*, 2020 Consumer Sentinel Data Book at 12; 2021 Consumer Sentinel Data Book at 12; 2022 Consumer Sentinel Data Book at 12; Robokiller 2022 Report at 4; Robokiller 2023 Report at 4.

[11] *See, e.g.*, FTC, Consumer Advice, *How to Recognize and Avoid Phishing Scams,* https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited Nov. 3, 2023); AT&T, Cyber Aware, *Text Message Scams,* https://about.att.com/pages/cyberaware/ni/blog/text_scams (last visited Nov. 3, 2023); Verizon, Account Security, *Smishing and Spam Text Messages,* https://www.verizon.com/about/account-security/smishing-and-spam-text-messages (last visited Nov. 3, 2023).

[12] FTC, Consumer Advice, *How to Recognize and Avoid Phishing Scams,* https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams (last visited Nov. 3, 2023).

[13] FTC, Consumer Advice, *How to Recognize, Remove, and Avoid Malware,* https://consumer.ftc.gov/articles/how-recognize-remove-avoid-malware (last visited Nov. 6, 2023).

[14] 47 U.S.C § 227(b)(1)(A); 47 CFR § 64.1200(a)(1); *see also* 47 CFR § 64.1200(a)(9) (providing exemptions to (a)(1)(iii) and noting that "the term 'call' includes a text message, including a short message service (SMS) call").  This restriction applies to calls directed to wireless numbers, as well as to emergency numbers and other specified locations.  For autodialed or prerecorded-voice telemarketing calls to wireless numbers, prior express consent must be written.  *See* 47 CFR § 64.1200(a)(2); *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 27 FCC Rcd 1830, 1838, para. 20 (2012) (*2012 TCPA Order*).  The seller bears the "burden of demonstrating that a clear and conspicuous disclosure was provided and that unambiguous consent was obtained."  *2012 TCPA Order*, 27 FCC Rcd at 1844, para. 33.  In the *Facebook v. Duguid* decision, the Supreme Court clarified that "a necessary feature of an autodialer under § 227(a)(1)(A) is the capacity to use a random or sequential number generator to either store or produce phone numbers to be called."  *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1173 (2021) (*Facebook*).

[15] *See* 47 CFR § 64.1200(a)(2).

**Federal Communications Commission**                      **FCC 23-107**

Internet-to-phone text messages, which are sent via the Internet to a provider and then routed to a consumer's phone over the provider's wireless network, are also covered by the TCPA.[16]  The Commission's DNC rules protect consumers from unwanted telephone solicitations or telemarketing calls to wireless[17] and wireline phones when the consumer has added the number to the National DNC Registry.[18]

9.     *Call Blocking, Robocall Mitigation, and Caller ID Authentication.*  To better protect consumers from bad actors that do not comply with the restrictions under the TCPA and National DNC Registry or otherwise place illegal calls or texts, the Commission has taken further steps to combat illegal calls.  This includes ensuring consumers have a say in which calls ring their phones, restoring faith in caller ID and making callers easier to identify, and holding voice service providers responsible for the calls they originate or transmit.

10.     Of particular interest here, the Commission has authorized providers to block calls in certain instances,[19] adopted safe harbors to ensure that providers are not subject to liability for blocking within certain constraints,[20] and in some cases mandated blocking of certain categories of calls that are highly likely to be illegal.[21]  These rules require certain voice service providers to block calls following notification of illegal traffic by the Commission and that providers immediately downstream block their traffic if they fail to do so.[22]  And the Commission has adopted rules mandating that voice service providers respond to traceback requests[23] and requiring originating, terminating, and intermediate voice

---

[16] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, 30 FCC Rcd 7961, 8019-20, paras. 113-15 (2015) (*2015 TCPA Declaratory Ruling and Order*) (describing services that allow senders to initiate texts via the Internet rather than via an individual phone where those texts look functionally equivalent to the recipient).

[17] In the *2003 TCPA Order*, the Commission concluded that the National DNC Registry should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act.  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14037-38, para. 33 (2003) (*2003 TCPA Order*).

[18] *2003 TCPA Order*, 18 FCC Rcd at 14033-39, 14116, paras. 25-36, 166; 47 CFR § 64.1200(c)(2), (e).  The National DNC Registry currently protects over 249 million telephone numbers from telemarketing sales calls, or "telephone solicitations."  *See* FTC, Reports, National Do Not Call Registry Data Book for Fiscal Year 2023, (Nov. 2023) https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2023 .  The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person" but not including calls or messages made with prior express invitation or permission, to any person with whom the caller has an established business relationship, or by a tax exempt nonprofit organization.  47 U.S.C. § 227(a)(4).

[19] *See* 47 CFR § 64.1200(k)(1), (2).

[20] *See* 47 CFR § 64.1200(k)(3), (4), (11).

[21] *See* 47 CFR § 64.1200(o).

[22] 47 CFR § 64.1200(n)(5), (n)(6).

[23] 47 CFR § 64.1200(n)(1).  Traceback is the process of following the call path back to the point of origin.  In the *Gateway Provider Order and Further Notice*, the Commission enhanced the existing traceback requirement to require gateway providers to respond to traceback requests within 24 hours.  *Advanced Methods to Target and Eliminate Unlawful Robocalls, Call Authentication Trust Anchor*, CG Docket No. 17-59, WC Docket No. 17-97, Sixth Report and Order in CG Docket No. 19-59, Fifth Report and Order in WC Docket No. 17-97, Order, Seventh Further Notice of Proposed Rulemaking in CG Docket No. 17-59 & Fifth Further Notice of Proposed Rulemaking in WC Docket No. 17-97, 37 FCC Rcd 6865, 6894-97, paras. 65-71 (2022) (*Gateway Provider Order and Further Notice*).  In the *May 2023 Call Blocking Order*, we expanded that enhanced requirement to cover all domestic voice service providers.  *Advanced Methods to Target and Eliminate Unlawful Robocalls*, Call Authentication Trust Anchor, CG Docket No. 17-59, WC Docket No . 17-97, paras. 21-28 (*May 2023 Call Blocking Order*).

service providers to implement the STIR/SHAKEN caller ID authentication framework in the IP portions of their networks.[24]  Taken together, these requirements help identify bad actors—both callers and voice service providers—and stop these calls at their source.

11.  *Enforcement*.  The Commission has also taken enforcement action to protect consumers against illegal calls.  For example, the *Sumco Forfeiture Order* found that certain robocall campaigns violated the TCPA for reasons including the telemarketers' failure to obtain prior express written consent before initiating telemarketing calls to wireless phones and residential lines.[25]  And the Commission recently required all voice service providers immediately downstream from a specific gateway provider to block and cease accepting all traffic from that gateway provider after it repeatedly allowed transmission of illegal robocalls into the United States.[26]

### B.    Combating Unwanted and Illegal Texts

12.  The Commission for the first time required providers to block certain texts that are highly likely to be illegal in March of 2023.[27]  The Commission required providers to block—at the network level—texts purporting to be from North American Numbering Plan (NANP)[28] numbers on a reasonable

---

[24] *See Call Authentication Trust Anchor, Implementation of TRACED Act Section 6(a)—Knowledge of Customers by Entities with Access to Numbering Resources*, WC Docket Nos. 17-97 and 20-67, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 3241, 3252, para. 24 (2020) (*First Caller ID Authentication Order*) (requiring originating and terminating providers to implement STIR/SHAKEN); *Call Authentication Trust Anchor*, WC Docket No. 17-97, Second Report and Order, 36 FCC Rcd 1859, 1876-97, paras. 36-73 (*Second Caller ID Authentication Order*) (providing implementation extensions to certain providers); *Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6886-894, paras. 51-63 (requiring gateway providers, a subset of intermediate providers, to implement STIR/SHAKEN); *Call Authentication Trust Anchor*, WC Docket No. 17-97, Sixth Report and Order and Further Notice of Proposed Rulemaking, FCC 23-18 (Mar. 17, 2023) at paras. 15-27 (*2023 Caller ID Authentication Order*) (requiring non-gateway intermediate providers that receive unauthenticated calls directly from originating providers to authenticate calls with STIR/SHAKEN by December 31, 2023); 47 CFR §§ 64.6301, 64.6302, 64.6304. STIR/SHAKEN caller ID authentication helps confirm that the caller ID is not spoofed, or otherwise provides information regarding what the signing voice service provider knows to be true about the caller and its right to use the number.  Protocols developed by the Secure Telephony Identity Revisited (STIR) working group of the Internet Engineering Task Force (IETF) work with the Signature-based Handling of Asserted information using toKENs (SHAKEN) implementation standards created by the Alliance for Telecommunications Industry Solutions (ATIS) and the SIP Forum.  *See First Caller ID Authentication Order*, 35 FCC Rcd 3241, 3244-46, paras. 5-10.

[25] *Sumco Panama SA, et al*, EB File No. EB-TCD-21-00031913, Forfeiture Order, FCC 23-64, at 12-13, paras. 25-26 (Aug. 3, 2023) (*Sumco Forfeiture Order*).

[26] *One Eye LLC*, EB Docket No. 22-174, Final Determination Order, DA 23-389, at 1, 2-3, paras. 1, 5 (May 2023) (*One Eye*).  More recently, the Enforcement Bureau issued an Initial Determination Order against One Owl Telecom for the apparent transmission of illegal traffic.  *One Owl Telecom Inc.*, EB Docket No. 22-174, Initial Determination Order, DA 22-174 (Sept. 2023).

[27] *See generally Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 21-402, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (Mar. 17, 2023) (*Text Blocking Order and Further Notice*).  Previously, the Commission's Enforcement Bureau had investigated instances of robotexting.  *See, e.g.*, *Emanuel (Manny) Hernandez, Click Cash Marketing, LLC, and Rock Solid Traffic*, Citation and Order, Unauthorized Text Message Violations, 33 FCC Rcd 12382 (EB 2018) (*Hernandez*); Public Notice, FCC Enforcement Advisory, *Robotext Consumer Protection, Text Message Senders Must Comply With The Telephone Consumer Protection Act*, 31 FCC Rcd 12615 (EB 2016).

[28] The NANP is the basic numbering scheme for the telecommunications networks located in American Samoa, Anguilla, Antigua, Bahamas, Barbados, Bermuda, British Virgin Islands, Canada, Cayman Islands, Dominica, Dominican Republic, Grenada, Jamaica, Montserrat, Saint Maarten, St. Kitts & Nevis, St. Lucia, St. Vincent, Turks & Caicos Islands, Trinidad & Tobago, and the United States (including Puerto Rico, the U.S. Virgin Islands, Guam, and the Commonwealth of the Northern Mariana Islands).  47 CFR § 52.5(d).

Do-Not-Originate (DNO) list, which includes numbers that purport to be from invalid, unallocated, or unused numbers, and NANP numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked.[29]  The Commission also took steps to ensure that any erroneous blocking can be quickly remedied, by requiring providers to maintain, or ensure that entities that block texts on their networks maintain, a point of contact for texters to report erroneously blocked texts.[30]

13.  The Commission also proposed a number of rules and revisions to further address the issue of unwanted and illegal texts, including: requiring terminating providers to block texts from a sender after they are on notice from the Commission that the sender is sending illegal texts; codifying that the National DNC Registry's protections extend to text messages; and banning the practice of marketers purporting to have written consent for numerous parties to contact a consumer, based on one consent.[31]

## III.    SECOND REPORT AND ORDER

14.  In this Second Report and Order, we take further steps to protect consumers from unwanted and illegal text messages and calls.  First, we require terminating providers to block texts from a particular number following Commission notification of illegal texts.  Second, we codify that the National DNC Registry protections apply to text messages.  Third, we encourage providers to make email-to-text an opt-in service.  Next, we close the lead generator loophole by requiring that texters and callers get written consumer consent for robocalls or robotexts from one seller at a time, and thus prohibit abuse of consumer consent by comparison shopping and other websites.  Finally, we decline at this time to adopt specific text authentication requirements.

15.  At the outset, we acknowledge the voluntary efforts providers have made to protect consumers from unwanted and illegal text messages, including blocking significant numbers of unwanted and illegal texts.[32]  We believe those efforts have gone a long way to protect consumers.  At the same time, the rapid increase in consumer losses resulting from scam texts makes clear that consumers need more protection.  As the Joint Consumer Commenters observe, the numbers of text-borne scams and the direct losses to consumers resulting from them have escalated dramatically in recent years.[33]

### A.    Mandatory Blocking Following Commission Notification

16.  We adopt, with some changes, our proposal[34] to require terminating providers to block all texts from a particular number or numbers when notified by the Enforcement Bureau of illegal texts from that number or numbers.  Upon receipt of the notice, a provider must block all texts from the

---

[29] 47 CFR § 64.1200(p).

[30] 47 CFR § 64.1200(r).

[31] *Text Blocking Order and Further Notice*, at paras. 48-62.

[32] For example, CTIA has reported that, between 2015 and 2020, the number of provider-blocked spam text messages grew 10 times, from an estimated 1.4 billion in 2015 to 14 billion in 2020.  CTIA Comments at 2.  CTIA observes that, "[t]o further protect consumers and the integrity of the text messaging platform, the wireless industry leverages best practices along with filtering software, machine learning tools, and other analytics that help curb unwanted or unlawful text messages."  CTIA, Messaging, *Protecting Consumers from Spam Messages*, https://www.ctia.org/homepage/messaging-channel (last visited Nov. 3, 2023).

[33] Joint Consumer Commenters at 2.

[34] *Text Blocking Order and Further Notice*, at paras. 50-53.

**Federal Communications Commission**         **FCC 23-107**

number(s) and respond to the Enforcement Bureau indicating that the provider has received the notice and is initiating blocking.[35]

17. We agree with commenters that support requiring terminating providers to block in these instances.[36] As one commenter noted, "[i]t is imperative that the Commission use every available tool to stop bad actors from sending texts to consumers that are illegal" and when a provider is on notice from the Commission it should block illegal texts.[37] A similar model has worked well in the call blocking context[38] and allows the Enforcement Bureau to take clear, decisive action to protect consumers.

18. We thus disagree with commenters that argue a blocking mandate is inappropriate because either providers already block texts or that the mandate may not otherwise significantly reduce the volume of illegal texts.[39] These commenters offer no specific or compelling evidence that providers consistently block all text traffic the Enforcement Bureau might identify as illegal.[40] Undisputed public data makes clear that unwanted and illegal texts are rising as is the financial loss that accompanies them.[41] If providers' voluntary efforts alone were enough to protect consumers, we would not see that trend. Thus, we believe that, just as with call blocking, a block-upon-notice requirement complements, rather than supplants, the work providers already do. The rule we adopt serves as an important backstop to ensure that consumers are protected against illegal texts.

19. Our experience with call blocking demonstrates that the Enforcement Bureau can act quickly and identify illegal traffic that providers have not blocked, and we see no reason to believe that it cannot do so here. We thus disagree with commenters who argue that the blocking process we adopt today may be slower, and thus less effective, than voluntary blocking measures by providers.[42] Nothing we require slows voluntary blocking – providers can (and we expect them to) continue to block and to improve their blocking going forward. Our new requirements instead will ensure they block texts their current blocking fails to capture, a necessary complement to their existing work. Providers that argue texters will have moved on to new numbers by the time the Enforcement Bureau identifies their texts

---

[35] We disagree with CTIA's assertion that requiring a provider to investigate prior to blocking would constitute "inappropriately delegating the Commission's investigatory responsibilities and determinations of lawfulness to wireless providers." Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278and 21-402, at 3 (filed Dec. 4, 2023) (CTIA Dec. 4 *ex parte*). However, we recognize that terminating providers "are not the 'choke point' for the suspect illegal traffic," that requiring terminating providers to investigate may in some cases impose a significant burden, and that it may lead to differing approaches for different providers. *Id.* at 4. We therefore do not require a provider to investigate before initiating blocking. We do, however, require providers to respond to the Enforcement Bureau's notice unless the Enforcement Bureau expressly exempts providers from that requirement in a particular situation. That could be as simple as an acknowledgement of receipt and indication that the provider will initiate blocking.

[36] *See, e.g.*, ECAC Comments at 2-3; Bankers Joint Commenters Reply at 9; State Attorneys General Reply at 19-20; VON Comments at 3-4 (supporting requiring blocking but also urging the Commission to add a traceback component and ensure that traffic is illegal before requiring blocking).

[37] Bankers Joint Commenters Reply at 9.

[38] *See, e.g., One Eye.*

[39] *See, e.g.*, CTIA Comments at 7-8 & Reply at 5; M³AAWG Comments at 4; T-Mobile Reply at 2-5; Twilio Reply at 3-7; Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 1-2 (July 25, 2023) (CTIA July 25 *ex parte*).

[40] *See, e.g.* CTIA Comments at 7-8 & Reply at 5; T-Mobile Reply at 2-5; Twilio Reply at 7.

[41] *See, e.g.*, 2020 Consumer Sentinel Data Book at 12; 2021 Consumer Sentinel Data Book at 12; 2022 Consumer Sentinel Data Book at 12; Robokiller 2022 Report at 4; Robokiller 2023 Report at 4.

[42] *See, e.g.*, M³AAWG Comments at 4; NetNumber Comments at 2-6; T-Mobile Reply at 3-4.

point to no specific evidence to that effect. Indeed, we believe that some texters undoubtedly use numbers until their texts no longer reach recipients at all. And, as detailed further below, we disagree with the comment that our requirements would unduly increase costs.[43] We believe that providers are already familiar with the similar call blocking requirements and extending those to texting should not represent a material additional burden.

20. We adapt the call blocking rule to text blocking to recognize important differences. First, we agree with commenters that there may not be a provider directly analogous to a gateway voice service provider in texting.[44] We therefore we require only terminating mobile wireless providers to block. Second, we do not require text blockers to also block traffic "substantially similar" to the traffic the Enforcement Bureau identifies to avoid blocking based on analytics that could lead to over blocking.[45] Texters that run afoul of this rule and find all texts from a particular number blocked can obtain a new number and, as long as they do not then use that number to send illegal texts, will not be blocked under this rule. This approach addresses record concerns about liability for blocking incorrectly, as well as potential burdens if we adopted a more expansive rule.[46] We also believe blocking based on a specific number or numbers identified by the Enforcement Bureau will be competitively neutral.[47] Additionally, we modify the process the Enforcement Bureau must follow, including not requiring an Initial Determination Order or Final Determination Order. These steps are unnecessary, because there is no requirement for downstream providers to block, and in fact no downstream providers at all, so a provider does not lose access to the network if it fails to comply.

21. *Notification of Illegal Texts*. Under our new rules, the Enforcement Bureau may notify terminating providers of illegal texts from a number or numbers. The Notification of Illegal Texts shall: (1) identify the number(s) used to originate the illegal texts and the date(s) the texts were sent or received; (2) provide the basis for the Enforcement Bureau's determination that the identified texts are unlawful;[48] (3) cite the statutory or regulatory provisions the illegal texts violate; (4) direct the provider receiving the notice that it must comply with section 64.1200(s) of the Commission's rules; and (5) provide a point of contact to be used by a subscriber to a listed number to dispute blocking. The Notification of Illegal Texts shall specify a reasonable time frame for the notified provider to respond to the Enforcement Bureau and initiate blocking.[49] The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418.

---

[43] CCA Comments at 2-3.

[44] *See, e.g.*, CTIA Comments at 10.

[45] *See, e.g.*, ECAC Comments at 4 (The common use of content analysis in text message blocking means that there is more opportunity and risk for overly broad interpretations of "substantially similar traffic."); CTIA Reply at 13 ("A bright-line rule requiring mandatory blocking based on the content of certain text messages (e.g., URLs) would only increase the incidences of blocking legitimate text messages.").

[46] CCA Comments at 2-3.

[47] *See, e.g.*, INCOMPAS Comments at 5; VON Comments at 3-4.

[48] The Notification should include any relevant nonconfidential evidence from credible sources.

[49] In our call blocking rules, we require the Enforcement Bureau to specify a timeframe of no fewer than 14 days for a notified gateway provider to complete its investigation and report its results. 47 CFR § 64.1200(n)(5)(i)(A). Here, however, we allow the Enforcement Bureau discretion to select a different response time, as providers are not required to investigate and the consequences of a terminating mobile wireless provider failing to comply with the deadline are less significant than in call blocking, where the ultimate consequence of a gateway provider failing to comply with our blocking rule is that immediate downstream providers will block all of the provider's traffic. *See id.* § 64.1200(n)(6). We note that the Enforcement Bureau will need to be able demonstrate that whatever timeframe it establishes, if shorter than 14 days, is reasonable.

22. *Responses to a Notification of Illegal Texts.* Upon receiving such notice, the provider must promptly begin blocking all texts from the identified number(s) within the timeframe specified in the Notification of Illegal Texts. The provider must respond to the Enforcement Bureau, including a certification that it is blocking texts from the identified number(s).

23. If the provider learns that some or all of the numbers have been reassigned, the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates the number has been reassigned.[50] If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking. In such instances, we encourage providers to continue to use other available methods to protect their customers. Providers are not required to monitor whether any numbers subject to this blocking requirement have been reassigned, but are required to notify the Commission and cease blocking if the provider learns of a number reassignment. We encourage providers that are able to monitor for number reassignments to do so.[51]

24. We do not adopt any additional protections in case of erroneous blocking, but any individual or entity that believes its texts are being blocked under this rule in error can make use of the point of contact required under section 64.1200(r) of the Commission's rules.[52] If the provider determines that blocking should cease, it should notify the Enforcement Bureau of that finding, including any evidence that supports that finding.

25. This rule shall be effective 180 days after publication of this Order in the Federal Register, to allow providers additional time to ensure that they are prepared to comply. However, we disagree that this rule requires Paperwork Reduction Act (PRA) approval[53] as it falls under the exception for collections undertaken "during the conduct of . . . an administrative action or investigation involving an agency against specific individuals or entities."[54]

**B.    National Do-Not-Call Registry**

26. We adopt our proposal to codify the National DNC[55] Registry's existing protections to text messages.[56] Texters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry. The Commission previously concluded that

---

[50] We strongly encourage providers to make an effort to determine whether a number has been reassigned in order to avoid blocking lawful texts from a different source. The Reassigned Numbers Database (RND) should be a useful tool for accomplishing this, and we are adopting a waiver to permit such use of the RND. *See infra* paras. 100-103.

[51] CTIA argued that requiring "providers to constantly monitor" the RND would impose an "unnecessary burden" and that we therefore did not account "for the significant and substantial burdens and costs of this obligation on wireless providers." CTIA Dec. 4 *ex parte* at 5-6. We clarify that monitoring the RND or any other source for number reassignments is not required and, instead, is a voluntary step that providers may take to help more quickly remedy issues where a number has been reassigned. We believe that some providers may wish to take this step, and may already have contracts with the RND for their own telemarking divisions, to better protect their customers. We do, however, require a provider that learns that a number has been reassigned to notify the Commission, so that the Commission can inform other providers that may also be required to block.

[52] 47 CFR § 64.1200(r).

[53] Letter from Alexandra Mays, Assistant General Counsel & Director, Regulatory Affairs, CCA, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402 (filed Dec. 6, 2023) (CCA Dec. 6 *ex parte*); CTIA Dec. 4 *ex parte* at 8-9.

[54] 44 USC § 3518(c)(1)(B)(ii); *see also* 5 CFR § 1320.4(a)(2).

[55] The Commission stated in the *2003 TCPA Order* that "wireless subscribers may participate in the national do-not-call list" and "we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers'" for purposes of our DNC rules. *2003 TCPA Order*, 18 FCC Rcd at 14039, para. 36.

[56] *Text Blocking Order and Further Notice* at paras. 55-57.

the national database should allow for the registration of wireless telephone numbers and that such action will further the objectives of the TCPA and the Do-Not-Call Act.[57] Our action is consistent with federal court opinions[58] and will deter both illegal texts and make DNC enforcement easier.

27. Commenters generally support this step.[59] As the Joint Consumer Commenters observe, section 64.1200(e) of the Commission's rules explicitly applies its DNC regulations to wireless telephone numbers and it would be anomalous to conclude that text messages to wireless numbers are "calls" for one part of the Commission's TCPA rules but not for the DNC protections.[60]

28. We disagree with a commenter that our proposal could undermine basic security protections because third-party, two-factor authentication providers could be prohibited from contacting end users whose numbers are on the National DNC Registry.[61] Two-factor authentication providers can simply avoid including solicitation or telemarketing in their texts. Such parties have other ways to contact their customers who may be on the DNC registry, such as obtaining their written consent for a text or call, or through email.

### C. Email-to-Text Messages

29. We encourage providers to make email-to-text an opt-in service as a way to reduce the number of fraudulent text messages consumers receive.[62] We do so in response to several commenters that observe texts originating from email addresses, rather than telephone numbers, account for a significant percentage of fraudulent text messages.[63] For example, ZipDX states that email-to-text gateways enable anyone to send a text message to a mobile subscriber in relative anonymity.[64] Commenters state that the email-to-text messages process allows the sender to be anonymous because the text is sent from an email account on a computer, not a phone number.[65] Commenters also observe

---

[57] *2003 TCPA Order*, 18 FCC Rcd at 14037-38, para. 33. In the *2003 TCPA Order*, the Commission, pursuant to section 227(c) of the Communications Act, adopted a national do-not-call registry, maintained by the FTC, to provide residential consumers with a one-step option to prohibit unwanted telephone solicitations. *2003 TCPA Order*, 18 FCC Rcd at 14034-35, para. 28.

[58] *See, e.g., Barton v. Temescal Wellness, LLC*, 525 F. Supp.3d 195 (D. Mass. 2021) (*Barton*); *Sagar v. Kelly Auto. Group, Inc*., No. 21-cv-10540-PBS, 2021 WL 5567408 (D. Mass. Nov. 29, 2021) (*Sagar*); *Hall v. Smosh Dot Com, Inc*., 72 F.4th 983, 986 (9th Cir. 2023) (*Hall*).

[59] *See, e.g*., State Attorneys General Reply at 21 (stating that this is a common-sense approach to eliminate any potential confusion in the industry and has the added benefit of providing protection to consumers regardless of whether the texting party utilizes an autodialer); Joint Consumer Commenters at 13-15; M³AAWG Comments at 4; CCA Comments at 5; Dobronski Comments at 9; Subbaiah Comments at 1; Shields Reply at 1-3.

[60] Joint Consumer Commenters at 13-15.

[61] INCOMPAS Comments at 6.

[62] The Commission previously concluded that the equipment used to originate Internet-to-phone text messages to wireless numbers via email or via a wireless carrier's web portal is an "automatic telephone dialing system" as defined in the TCPA, and therefore calls made using the equipment require consent. *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8017-8022, paras. 111-122.

[63] ZipDX Comments at 2; Somos Reply at 5; Bankers Joint Commenters Reply at 8.

[64] ZipDX Comments at 2.

[65] ZipDX Comments at 2; Somos Reply at 5 (brand impersonation scams are increasingly widespread form of text scam).

a spike in text impersonation scams originating from email-to-text gateways.[66]  Below we seek comment on requiring providers to make this service opt-in.

### D.    Closing the Lead Generator Loophole

30.  We now make it unequivocally clear that texters and callers must obtain a consumer's prior express written consent to robocall or robotext the consumer soliciting their business.  We also make it unequivocally clear that this requirement applies a single seller at a time, on the comparison shopping websites that often are the source of lead generation, thus closing the lead generator loophole.[67]  Lead-generated communications are a large percentage of unwanted calls and texts and often rely on flimsy claims of consent to bombard consumers with unwanted robocalls and robotexts.[68]  While many comparison shopping websites that involve lead generation (i.e., websites that generate a consumer "lead" for a seller) benefit consumers by enabling them to quickly compare goods and services and discover new sellers,[69] the record is clear that new protections are necessary to stop abuse of our established consent requirements.[70]  We also require that the consent must be in response to a clear and

---

[66] Somos Reply at 5; Bankers Joint Commenters Reply at 8 (observing that bad actors are distributing large volumes of SMS phishing messages from email addresses (which convert the e-mail message to an SMS text message).

[67] The TCPA generally requires callers to get consumer consent before making certain calls to consumers using an "automatic telephone dialing system" (also known as an "autodialer") or an artificial or prerecorded voice.  47 U.S.C. § 227(b)(1)(A).  Since 2003, the Commission has applied the consent requirement to text messages using an autodialer and "made to a telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged."  *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.  This encompasses both voice calls and text calls to wireless numbers including, for example, SMS calls, provided the call is made to a telephone number assigned to such service.  *Id*.  In the Further Notice of Proposed Rulemaking, we sought comment on a proposal that for TCPA consent "prior express written consent to receive calls or texts must be made directly to one entity at a time."  *Text Blocking Order and Further Notice* at para. 61. IMC contends that we do not have statutory authority to adopt or revise the definition of prior express written consent.  Letter from Insurance Marketing Coalition to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 5-7 (Dec. 6, 2023) (IMC Dec. 6 *ex parte*).  We disagree and note that the Commission adopted a definition of prior express written consent in the *2012 TCPA Order*.  *2012 TCPA Order*, 27 FCC Rcd at 1838-1844, paras. 20-34 (requiring prior express written consent for telemarketing robocalls to wireless numbers and residential lines).

[68] USTelecom Comments at 2.

[69] *See* Federal Trade Commission, Follow The Lead:  An FTC Workshop On Lead Generation (Oct. 30, 2015) at 5 (available at https://www.ftc.gov/system/files/documents/videos/follow-lead-ftc-workshop-lead-generation-part-1/lgw-transcript-pt1.pdf) (noting that lead generation is a well-established industry that offers benefits to both consumers and advertisers).  *But see also* Federal Trade Commission, "Follow The Lead" Workshop, a Staff Perspective (Sept. 2016) (available at https://www.ftc.gov/system/files/documents/reports/staff-perspective-follow-lead/staff_perspective_follow_the_lead_workshop.pdf) (observing that consumers who fill out web forms may not realize they are operated by lead generators, i.e., not merchants, or may not know that this information can be sold and re-sold multiple times).  Commenters contend that comparison shopping saves consumers money.  *See, e.g*., Letter from United States Senators Thom Tillis and Marsha Blackburn, to Jessica Rosenworcel, Chairwoman, FCC, at 1 (Dec. 6, 2023) (Dec. 6 Congressional); Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, Attach. at 3 (Dec. 6, 2023) (LendingTree Dec. 6 *ex parte*).  There is no evidence that unequivocally requiring one-to-one consent would reduce this benefit to consumers.  IMC contends that each year millions of satisfied consumers provide prior express consent to comparison shopping sites and are satisfied with the calls they receive and thus do not file complaints with regulators. IMC Dec. 6 *ex parte* at 2.  This, of course, does not rebut arguments in the record that consent abuse by comparison shopping websites harms consumers.

[70] Several commenters describe such abuses, *see, e.g*., Connors Comments at 1 (discussing Coverage Vista, https://www.coverage-vista.com/, with a list of hundreds of "partners" in a hyperlink (https://coverage-vista.com/disclaimer.php) that the consumer would "consent" to by asking for insurance information from the

(continued….)

conspicuous disclosure to the consumer and that the content of the ensuing robotexts and robocalls must be logically and topically associated with the website where the consumer gave consent.[71]

31.  *One-to-One Consent.*  As an initial matter, we agree with the several commenters, including consumer groups, State Attorneys General, and members of Congress that we must take action to close the lead generator loophole and stop consent abuse by unscrupulous robotexters and robocallers.[72]  We agree with the Joint Consumer Commenters, who argue that the "resale of consumer data by lead generators and lead aggregators significantly contributes to the problem of illegal calls."[73]  We agree with commenters that requiring one-to-one consent obtained with a clear and conspicuous disclosure to the consumer is the way to close this loophole.[74]  Unequivocally requiring one-to-one

---

[71] Coverage Vista insurance site); USTelecom Comments at 4 (USTelecom also notes that this was discussed in the *Sumco NAL* at paras. 45-48); Joint Consumer Commenters at 4 & Reply at 8; Presley Comments at 1; Dobronski Comments at 3; Shields Reply at 3-5 (observing that the LendingTree partner list contains marketer EverQuote which has more than 2247 partners on its own list of partners; similarly, the QuoteWizard list also contains companies that have nothing to do with insurance such as auto warranty companies, lead generators, and marketers); Keller Reply at 1-3; Douglas Reply at 1; State Attorneys General Reply at 2-4 (describing the Assurance IQ list of over 2000 "partner companies," some of which were other lead generation and telemarketing companies).  For a description of the chain of lead generators and telemarketers associated with QuoteWizard, *see Mantha v. QuoteWizard.com, LLC*, No. 19-12235-LTS, 2022 WL 325722 (D. Mass. Feb. 3, 2022) (*Mantha*) at *10 (QuoteWizard alleged that it obtained consent when the plaintiff visited the Snappy Auto website operated by Fenix Media, and the lead was sold by Fenix Media to Plural, then to RevPoint, and then to QuoteWizard; however, the IP addresses associated with such consent did not belong to the plaintiff and the "lead identification" number for the consent was not associated with the plaintiff or with Snappy Auto.).

[71] Under our existing rules, prior express written consent under the TCPA means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.  47 CFR § 64.1200(f)(9).  A similar rule, to obtain prior express invitation or permission for a telemarketing call to a DNC line, the caller must meet the requirements of section 64.1200(c)(2)(ii) of the Commission's rules:  "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed."  We did not seek comment on, and we are not revising, section 64.1200(c)(2)(ii).  We disagree with the assertion made by IMC that requiring one-to-one consent is a content-based restriction on speech subject to strict scrutiny.  IMC Dec. 6 *ex parte* at 7-9.  On the contrary, the rule we adopt here (and the requirements of section 64.1200(c)(2)(ii), which we are not revising) are clear that consent must be between the consumer and seller; we are making it unequivocal that such consent for TCPA purposes must be one-to-one between the consumer and seller.  This is also consistent with the FTC's Telemarketing Sales Rule which requires one-to-one consent.  Requiring that a consumer consent to be contacted by each seller (if applicable) is not a content-based restriction on IMC's speech, but a logical and consistent measure of consumer protection.

[72] *See, e.g.*, Joint Consumer Commenters at 2; USTelecom Comments at 2; State Attorneys General Reply at 5;; Letter from Alexander H. Burke, Burke Law Offices, LLC, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402 (Dec 5, 2023) (Burke Dec. 5 *ex parte*); Letter from United States Senators Ben Ray Luján, Edward J. Markey, Peter Welch, Chris Van Hollen, Elizabeth Warren, Angus S. King, Jr., Richard J. Durbin, Martin Heinrich, Mark R. Warren, Gary C. Peters, Ron Wyden, Amy Klobuchar, to Jessica Rosenworcel, Chairwoman, FCC, at 1 (Aug. 7, 2023) (Aug. 7 Congressional).

[73] Joint Consumer Commenters Reply at 10, (citing Shields Comments at 4; Connors Comments at 1; Presley Comments at 2). *See also* USTelecom Comments at 2-3.

[74] *See, e.g.*, USTelecom Comments at 3; State Attorneys General Reply at 13; Presley Comments at 2; Dobronski Comments at 9-10; Subbaiah Comments at 1; Joint Consumer Commenters at 15-17.  The Joint Consumer Commenters state that, instead of revising the TCPA consent rule, the Commission should affirm the single-seller interpretation  of section 64.1200(f)(9) and take enforcement action against telemarketers making use of illegitimately obtained consumer "consent."  Joint Consumer Commenters at 15.  *See also* Aug. 7 Congressional at 1

(continued….)

**Federal Communications Commission**                                    **FCC 23-107**

consent will end the current practice of consumers receiving robocalls and robotexts from tens, or hundreds, of sellers—numbers that most reasonable consumers would not expect to receive.[75]

32.  Our requirement stops the practice of buried, barely visible disclosures that, as USTelecom explains, appear in fine print on a website or only accessible through a hyperlink, burdening the consumer with yet another step to be fully informed.[76]  This requirement ensures that consumers consent only to sellers they wish to hear from[77] and will stop the abuses we saw, for example, in *Urth Access*, where the websites at issue included TCPA consent disclosures whereby the consumer "consented" to receive robocalls from "marketing partners."[78]  Those "marketing partners" were only visible to the consumer if the consumer clicked on a specific hyperlink to a second website that contained the names of 5,329 entities.[79]  With this requirement we make it clear that sharing lead information with a daisy-chain of "partners" is not permitted.  Our action is also consistent with the FTC's Telemarketing Sales Rule (TSR), which some commenters observe requires one-to-one consent.[80]  As the State Attorneys General argue, it is not necessary to require a consumer to agree to

---

[footnote continued] ("Both the [DNC and the TCPA rules] clearly set out the types of protections intended by Congress to eliminate unwanted telemarketing calls.  Both of these regulations allow robocalls *only if* the call recipients sign a written agreement relating to calls from a *single seller*.").  Instead, we find that the rule we adopt here will make it unequivocally clear that texters and callers must obtain a consumer's prior express written consent for calls or texts from a single seller at a time.

[75] Zillow contends that its process for connecting an agent to a prospective customer could be problematic under our revision to prior express written consent under the TCPA because Zillow would not have the name of the agent until after the customer consents to be so contacted.  Letter from Luke Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 1-3 (Dec. 8, 2023) (Zillow Dec. 8 *ex parte*).  However, based on Zillow's description of the contact between the agent and the customer, it appears to be a live call (where Zillow adds the agent to the call), and not autodialed, or using a prerecorded or artificial voice, and therefore a process appropriate under the TCPA prior to and after the subsequent changes to the regulations contained in this Order, and thus our rule change would not be relevant to that interaction.

[76] USTelecom Comments at 2.  *See also* State Attorneys General Reply at 5 (explaining how telemarketers typically collect consent forms and then sell the consumers' data to intermediaries that then compile and sell the data to other telemarketers); Presley Comments at 1 (observing that the lead generation industry is in the business of selling leads, not selling goods or services to consumers).

[77] Joint Consumer Commenters at 21.  In addition, as commenters observe, allowing consent to multiple sellers at a time may make revocation of consent to multiple sellers difficult.  Joint Consumer Commenters at 18-19; State Attorneys General Reply at 12-13.  A called party may revoke consent at any time and through any reasonable means.  A caller may not limit the manner in which revocation may occur.  *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-90, para. 47.  Consent is granted from a consumer to a seller to be contacted at a particular wireless phone number or residential line.  *2012 TCPA Order*, 27 FCC Rcd at 1838, para. 20.  Revocation of consent is instruction that the caller no longer contact the consumer at that number.  We also disagree with the contention that if a consumer revokes consent for autodialed text messages from a seller on one text messaging chain, the seller can continue to send that consumer texts or calls through a different program or chain.  RILA Reply at 15.  The Commission has never bifurcated consent in such a manner and does not endorse it here.

[78] *Urth Access, LLC*, EB File No. EB-TCD-22-00034232, Order, DA 22-1271 (Dec. 8, 2022) (*Urth Access*).  Similarly, in the *Avid Telecom Notice*, the Enforcement Bureau observed that two of Avid's websites were devoid of any language stating that the consumer was agreeing to receive telemarking calls and, to the extent the callers are disclosed elsewhere through a hyperlink, such disclosures would be insufficient to establish consent.  Letter from Loyaan Egal, Chief, Enforcement Bureau, FCC, to Michael Lansky, Chief Executive Officer, Avid Telecom (June 7, 2023) (*Avid Telecom Notice*), available at https://www.fcc.gov/document/fcc-orders-avid-telecom-cease-and-desist-robocalls (last visited Nov. 3, 2023).

[79] *Urth Access* at para. 16.

[80] *See, e.g.*, Joint Consumer Commenters at 22 (citing the FTC Business Guidance); State Attorneys General Reply at 10-11; Burke Dec. 5 *ex parte* at 2 (contending that the best way to provide true clarity to industry groups and

(continued….)

receive robocalls or robotexts from multiple, potentially hundreds, of other callers in order for them to access the services of comparison-shopping website.[81]  We believe that adopting the revised rule is the best way to make unequivocally clear that one-to-one consent is required under the TCPA and to stop large numbers of robocalls and robotexts from many different entities based on a single grant of consumer consent.[82]

33.  Grounded in our authority under the TCPA, our rule requires consent to one seller at a time.  Comparison shopping websites can provide additional information about sellers or a list of sellers that a consumer can affirmatively select in order to be contacted.  In adopting our requirement, we reject the proposal to permit consent to a hyperlinked list of sellers, effective for a limited number of sellers to whom the consumer is matched only after already having provided consent to robocall and robotext.[83]  We find that this proposal would unnecessarily require consumers to consent to a potentially lengthy list of entities that may not be relevant to the product or service the consumer is seeking.  The commenters advocating for this proposal have not explained why they could not implement one-to-one consent for each seller.[84]  In other words, such commenters failed to articulate why, under their current lead generation processes, a consumer should be deprived of the opportunity to consent to robocalls and robotexts after the "match" between consumer and seller is made.

34.  We do not prescribe the number of sellers that a comparison shopping website can list for purposes of the prior express written consent rule.[85]  We believe that this is an important business

---

consumers is to conform the Commission's rules to the FTC's one-to-one seller-to consumer consent rule); LendingTree, however, disagrees and observes that under the FTC rule, calls or texts delivered using an autodialer are not subject to the same requirement.  Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Dec. 6, 2023) (LendingTree Dec. 6 *ex parte* Burke Response).  *See also* Federal Register, Vol. 73, No. 169, 51164, 51182 (Aug. 29, 2008); FTC, Business Guidance, "Complying with the Telecommunications Sales Rule," https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule#writtenagreement (last visited Oct. 18, 2023).

[81] State Attorneys General Reply at 17.  IMC contends that a lengthy hyperlinked list does not necessarily mean that the consumer will get called by all the sellers on the list.  IMC Dec. 6 *ex parte* at 4.  However, the record has evidence of unrelated companies, including other lead generators, on such hyperlinked lists.  *See, e.g.*, State Attorneys General Reply at 2-4 (describing the Assurance IQ list of over 2,000 "partner companies," some of which were other lead generation and telemarketing companies).

[82] *See, e.g.*, Joint Consumer Commenters at 15-16; USTelecom Comments at 5; State Attorneys General Reply at 7.  Commenters also suggest that the Commission issue guidance restating the rules regarding telemarketing calls.  Aug. 7 Congressional.  These commenters also request that we issue guidance on the requirements of the federal E-Sign Act.  *Id.*  That topic, however, is outside the scope of this rulemaking.

[83] LendingTree Comments at 3 (contending that comparison-shopping providers should be permitted to disclose the specific companies to whom the consumer's consent extends after the comparison-shopping service has matched the consumer to potential providers); LendingTree Dec. 6 *ex parte*, attach. At 10; QuinStreet Nov. 30 *ex parte* at A-1 (suggesting that we amend the definition of prior express written consent to specify that if a hyperlink is used to identify potentially matched sellers, then consent will apply only to those entities identified in a "match notice" subsequently transmitted to the consumer).

[84] *See, e.g.*, Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 30, 2023) (LendingTree Nov. 30 *ex parte*) (contending that it undermines the premise of the comparison shopping platform to require the consumer to give consent multiple times in order to engage in the comparison); IMC Dec. 6 *ex parte* at 3-4.  As ZipDX observes, after the specific matches are displayed, the consumer could review the matches and grant consent individually to each seller from which it wished to hear. Email from David Frankel, ZipDX, to FCC, CG Docket Nos. 02-278 and 21-402, (Dec. 3, 2023) (ZipDX Dec. 3 *ex parte*).

[85] *See, e.g.*, NAMIC Comments at 4 (proposing no more than 10); AAAB Comments at 1 (specify the maximum number); SEIA Comments at 3 (proposing three); Chandler Comments at 2 (proposing five); LendingTree Dec. 6 *ex*

(continued….)

decision that belongs to those websites and other lead generators and would not close the lead generator loophole.  We do not believe that it would provide consumers with sufficient control over which parties they consent to receive robocalls or robotexts from, and would still deprive consumers of the ability to grant consent only to those sellers from which they wish to receive robocalls or robotexts.  Consumers would be forced to consent to all callers on the list without the ability to limit that list for purposes of their comparison shopping.  Further, this alternative would not prevent the daisy-chaining of consents whereby a seller on the initial list would then resell or otherwise share their consent to another lead buyer and so on potentially hundreds of times.[86]  If the comparison shopping website seeks to obtain prior express written consent from multiple sellers, the webpage must obtain prior express written consent separately for each seller.[87]  In addition, other sellers can be included on the web page for reasons other than obtaining consent, e.g., for contact that does not require TCPA prior express written consent, or with information allowing the consumer to contact the seller directly.[88]  These commenters have not offered any data on why the number of sellers they suggest is better than a different number of sellers.

35.  *Clear and Conspicuous Disclosure and Logically and Topically Related.*  We adopt two additional protections to further guard against consent abuse and protect consumers from unwanted robocalls and robotexts.  First, the one-to-one consent must come after a clear and conspicuous disclosure to the consenting consumer that they will get robotexts and/or robocalls from the seller.  "Clear and conspicuous" means notice that would be apparent to a reasonable consumer.[89]  In addition,

---

[86] *parte*, attach. at 10 (proposing five).  We also do not adopt the proposal to add to the definition of consent the types or categories of property, goods, or services about which the person agrees to be called, the total number of callers that may call the person, or the maximum time period(s) in which such callers may call the person.  IMC Comments at 3; IMC Dec. 6 *ex parte* at 1-2 & n.4.  We also decline to limit how many times one seller can call a consumer, as the issue is outside the scope of this proceeding.  Drip Comments at 3-4 (proposing five calls in 24 hours).

[86] Joint Consumer Commenters Reply (citing REACH Comments at 3, where REACH explained that the lead generator industry works to facilitate telemarketing robocalls in that "once the consumer has submitted the consent form the company seeks to profit by reselling the "lead" multiple—perhaps hundreds—of times over a limitless period of time.); Shields Reply at 3-5 (observing that the LendingTree partner list contains marketer EverQuote which has more than 2247 partners on its own list of partners).

[87] *See infra* para. 41, (noting that "the website may offer a consumer a check box list that allows the consumer to choose each individual caller that they wish to hear from").

[88] Our rules also require that the written consent agreement "include a clear and conspicuous disclosure" providing certain information to the person signing, 47 CFR § 64.1200(f)(9), an additional requirement website publishers must follow.

[89] 47 CFR § 64.2401(e).  We use the same definition for junk fax opt-out notice requirements.  *See Rules and Regulations Implementing the Telecommunications Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005*, CG Docket 02-278, Report and Order and Third Order on Reconsideration, 21 FCC Rcd 3787, 3801, para. 26 (2006) (Consistent with the definition in our truth-in-billing rules, "clear and conspicuous" for purposes of the opt-out notice means a notice that would be apparent to a reasonable consumer.).

**Federal Communications Commission**         **FCC 23-107**

if compliance with the federal Electronic Signatures in Global and National Commerce Act (the E-Sign Act)[90] is required for the consumer's signature, then all the elements of E-Sign must be present.[91]

36. Second, we adopt our proposal that robotexts and robocalls that result from consumer consent obtained on comparison shopping websites must be logically and topically related to that website.[92] Thus, for example, a consumer giving consent on a car loan comparison shopping website does not consent to get robotexts or robocalls about loan consolidation.[93] We therefore agree with commenters who argue that consumers deserve protection against calls that go beyond the scope of consent, a scope that can be reasonably inferred from the purpose of the website at which they gave that consent.[94] We believe that texters and callers are capable of implementing this standard and, when in doubt, will err on the side of limiting that content to what consumers would clearly expect. As a result, we decline to adopt a definition of "logically and topically" at this time as some commenters suggest.[95]

37. *Preserving Comparison Shopping and Protecting the Needs of Small Businesses.* The rule we adopt today best balances the desire of businesses to utilize lead generation services to call and text potential customers with the need to protect consumers, including small businesses, from a deluge of unwanted robocalls and robotexts. We recognize the value that comparison shopping offers to consumers who seek specific goods and services, and the value that lead generators offer to businesses, including small businesses, seeking new customers.[96]

38. We understand the concerns of commenters like SBA's Office of Advocacy who note that certain small businesses rely on purchasing sales leads from lead generators and who share their "unease" with our rule.[97] Taking that concern into consideration, we make clear that the rule we adopt today only limits sellers, of any size, from robocalling or robotexting consumers who did not explicitly

---

[90] Pub. L. No. 106-229, 114 Stat. 464 (2000) (codified at 15 U.S.C. §§ 7001-7006). The E-Sign Act establishes rules for satisfying a requirement for a writing or a signature with their electronic equivalents. Joint Consumer Commenters Reply at 5-7 (observing that the rules of the federal E-Sign Act apply whenever agreements consenting to telemarketing calls are entered into online); Aug. 7 Congressional at 1 ("Although telemarketers routinely ignore the requirements of the E-Sign Act, the legislation's mandate for E-Sign consent before writings can be provided in electronic records in 15 U.S.C. § 7001(c) is fully applicable.").

[91] *See, e.g.*, Joint Consumer Commenters at 31-32 & Reply at 5-7; State Attorneys General Reply at 14-15. In the *2012 TCPA Order*, the Commission concluded that consent obtained in compliance with the E-Sign Act will satisfy the requirements of our rule, including permission obtained via an email, web site website form, text message, telephone keypress, or voice recording. *2012 TCPA Order*, 27 FCC Rcd at 1844, para. 34. Although we are amending our prior express written consent TCPA rule here, we continue to find that compliance with the federal E-Sign Act will satisfy the requirements of our revised rule.

[92] *Text Blocking Order and Further Notice* at para. 61.

[93] Thus, we disagree with IMC's contention that on a loan comparison website a consumer can be solicited about loan consolidation. IMC Dec. 6 *ex parte* at 2-3.

[94] *See, e.g.*, USTelecom Comments at 5; VON Comments at 7-8; Chandler Comments at 1; QuinStreet Comments at 7; Letter from Lucas Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Oct. 27, 2023) at 3 (Zillow Oct. 27 *ex parte*).

[95] *See, e.g.*, UHC Comments at 4; PACE Comments at 5; Bankers Joint Commenters Reply at 13-16.

[96] *See, e.g.*, OLA Comments at 3 (observing that small-dollar lead generators often connect underserved consumers with credit providers willing to quickly help solve the needs of the credit challenged); REACH Comments at 4 (lead generators can be "an engine that drives a huge number of small and independent companies that do not have their own robust marketing team"); Dec. 6 Congressional at 2 ("Comparison shopping … allows smaller businesses to compete on a level field against larger entities.").

[97] Letter from Major L. Clark III and Jamie Belcore Saloom, Small Business Administration Office of Advocacy, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 1-2 (Dec 1, 2023) (SBA Dec. 1 *ex parte*).

consent to receive such communications from a particular seller.  As the Joint Consumer Commenters point out, "[l]ead generators can still…conduct business as they are currently with minimal changes: they can collect and share leads to consumers interested in products and services, they just will not be able to collect and share the consents for telemarketing calls that included an artificial or prerecorded voice or made with an automatic dialer."[98]  Moreover, sellers that wish to use robocalls and robotexts for such communications may still do so—provided they obtain consent consistent with the reasonable limits codified in today's rule.

39.  Our rule does not restrain comparison shopping, nor does it unnecessarily constrain a businesses' ability to rely on leads purchased from lead generators.[99]  For example, consumers may reach out to multiple businesses themselves or ask to be contacted only by businesses through means other than robocalling and robotexting.  Further, sellers may avail themselves of other options for providing comparison shopping information to consumers.[100]  They may initiate calls or texts consumers without using an autodialer or prerecorded or artificial voice messages.[101]  They may use email or postal mail, both to provide information and to solicit further one-to-one consent to robocall or robotext.  Nothing in our rule restricts the ability of businesses, including small businesses, from relying on leads generated by third party lead generators.[102]

40.  Furthermore, while the record suggests that comparison shopping can benefit consumers and businesses alike, no commenter provides specific evidence that the limit we establish today would have any deleterious effect on the ability of consumers to comparison shop or businesses to assist consumers in doing so.  Indeed, commenters that tout the benefits of comparison shopping (and we do not doubt those benefits),[103] make no effort to tie those benefits exclusively to comparison shopping websites or to sellers that use robocalls or robotexts through consent that is not one-to-one to reach consumers.

41.  Additionally, we find that, even under our new rule, comparison shopping websites can obtain the requisite consent for sellers to robocall and robotext consumers using easily-implemented methods.  For instance, a website may offer a check box list that allows the consumer to choose each seller that they wish to hear from.[104]  Alternatively, a comparison shopping website may offer the consumer a clickthrough link to a business so that it may obtain requisite consent from the consumer directly.  Our rule does not prohibit websites from obtaining leads and merely codifies reasonable limits on when those leads allow sellers to use robocalls and robotexts to reach consumers.

---

[98] Letter from Margot Saunders, Senior Counsel, National Consumer Law Center, to Marlene H. Dortch, Secretary, FCC, CG Docket No. 02-278, at 4 (Dec 1, 2023) (Joint Consumer Commenters Dec. 1 *ex parte*).

[99] SBA Dec. 1 *ex parte* at 2.

[100] *See, e.g.,* Joint Consumer Commenters Dec. 1  *ex parte* at 4.

[101] However, if the calls or text messages are sent to lines that are registered with the DNC Registry, compliance with our regulations regarding those messages is required.

[102] SBA Dec. 1 *ex parte* at 2.

[103] *See, e.g.*, LendingTree Dec. 6 *ex parte*  attach. At 3 (explaining that comparison shopping saves consumers money).

[104] Joint Consumer Commenters Reply at 13; State Attorneys General Reply at 17.  We disagree with the commenters who oppose check boxes, contending that customers could miss them, particularly on a mobile device.  *See, e.g.*, Letter from Steven A. Augustino, counsel for LendingTree, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, Attach. at 5 (Dec. 5, 2023) (LendingTree Dec. 5 *ex parte*).  There is no indication in the record that such check boxes are unworkable, particularly in light of the extended implementation period we are providing to affected parties to implement solutions.

**Federal Communications Commission**                      FCC 23-107

42. We disagree with commenters who suggest that requiring one-to-one consent would be detrimental to consumers and small businesses.[105] First, while we agree that some businesses may have to alter their business practices to provide more transparency upfront to consumers, commenters have not explained why such changes to their current business practices will result in their inability to continue doing business. Nowhere in the record has any commenter provided specific evidence to demonstrate that such a rule would harm their businesses in a way that would outweigh the need to protect consumers, including small businesses, from the "nuisance" and "invasion of privacy" resulting from unwanted automated and prerecorded calls.[106] These commenters have not, for example, offered evidence of what fraction of their business involves robocalls and robotexts and thus how much of their total business would be affected by the new rule. Nor do they indicate how much it would cost to modify their websites and processes to disclose to the consumer who will call and get consent for each such caller. Nor do they quantify the cost to small businesses of disclosing their names before consumers consent. More broadly, none of these parties account for possible offsetting benefits to businesses, including small businesses, of disclosing the business name before consent. In short, the record is devoid of any evidence that leads us to conclude the cost of implementation for all businesses, large and small, is material.

43. Our existing rules already require that callers and texters demonstrate that they have obtained valid consent from the called party.[107] Thus, we also find that the new rule will assist callers and texters in at least two ways. First, the rule protects callers who rely on leads generated by third parties by ensuring that such callers operate pursuant to legally sufficient consent from the consumers. A caller who is unable to meet its burden of proof in demonstrating that it had valid consent to initiate and robocall or robotext to the individual consumer would be liable under the TCPA for making such a call. The rule we adopt today helps callers and texters, including small businesses, by providing legal certainty as to how to meet their burden of proof when they have obtained consent via a third-party. In other words, businesses

---

[105] Several commenters generally oppose one-to-one consent and contend that it would hurt small businesses, but they have not shown that any the businesses would actually be harmed by complying with the TCPA consent requirements (if applicable). *See, e.g.*, SolarReviews Comments at 3-4; OLA Comments at 3-4; Wagoner Comments at 1; Harvey Comments at 3; REACH Comments at 8; Letter from Yaron Dori and Jorge Ortiz, counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 2 (Aug. 30, 2023) (QuinStreet Aug. 30 *ex parte*); Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Sept. 20, 2023) (REACH Sept. 20 *ex parte*); SBA Dec. 1 *ex parte* at 1-2; Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Sept. 15, 2023) (REACH Sept. 15 *ex parte*); Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 16, 2023) (EXP Realty *ex parte*); Letter from Jonathan Thessin, Vice President, Senior Counsel, American Bankers Association, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, (Nov. 30, 2023) (ABA Nov. 30 *ex parte*); IMC Dec. 6 *ex parte* at 3; Dec. 6 Congressional at 1-3.

[106] *See* Pub. L. No. 102–243, § 2, at ¶¶ 5–6, 9–10, 13–14, 105 Stat. 2394 (1991); 137 Cong. Rec. S16206 (1991) (statement of Sen. Warner in support of the TCPA) ("Indeed the most important thing we have in this country is our freedom and our privacy, and this is clearly an invasion of that...."); S. Rep. No. 102-178, at 5 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services."). *See also* Joint Consumer Commenters Dec. 1 *ex parte* at 3. Robokiller 2022 Report at 4 (estimating the financial losses from text scams alone to be approximately $20 billion in 2022, and this figure does not include the nuisance costs of spam texts); Robokiller 2023 Report at 9 (estimating the financial losses due to robocall scams to be $33 billion for the first half of 2023).

[107] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-7993, paras. 47-54. We also note that to obtain prior express invitation or permission for a telemarketing call to a DNC line, the caller must meet the requirements of section 64.1200(c)(2)(ii) of the Commission's rules: "Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." We did not seek comment on, and we are not revising, section 64.1200(c)(2)(ii).

Federal Communications Commission                    FCC 23-107

relying on such leads will have an easier and more certain way to demonstrate that they have obtained valid consent to call.

44. Second, we agree with the Joint Consumer Commenters that small businesses themselves will benefit from the protections we adopt. Small businesses also may use comparison shopping services when comparison shopping for businesses services. As the Joint Consumer Commenters note, our prior express written consent requirements are not limited to residential lines.[108] Rather, these requirements extend to and protect business phones from having their own phones inundated with unwanted calls and texts. Such calls to these businesses may tie up small business phones, annoy small business employees, and subject them to the same type of fraud as consumers generally. As the Joint Consumer Commenters argue, "[t]his is especially helpful for small business owners who feel they must answer all of their calls because each call may be from a potential customer. So, they are unable to ignore calls from strange numbers."[109]

45. We also heard from commenters who contend that our rule would harm small businesses because consumers will not choose them if given a transparent choice.[110] We disagree with those comments and note that commenters provided no evidence that consumers will choose larger businesses over smaller or more regional businesses. As the Joint Consumer Commenters argue, "[s]ome consumers may prefer to receive offers from large, well-known businesses and others may prefer to receive offers from small, local businesses. Consumers may also want to receive offers from both and compare the offers."[111] We agree with the Joint Consumer Commenters that there is no basis in the record "on which to assume that consumers will never consent for telemarketing calls from small businesses if they are pitched at the same time as large businesses."[112] Indeed, even if this were the case, we believe that consumers have the right to make that determination and to choose those callers for which they consent to receive autodialed and/or prerecorded calls or texts.

46. *Assisting Businesses with Compliance.* We want this important consumer protection rule to be successfully implemented by comparison shopping websites and lead generators. While we find that our rule does not unduly burden callers or comparison shopping websites, we nonetheless give sellers, texters, and callers, and any third-party websites they obtain consent through, a 12 month implementation period to make the necessary changes to ensure consent complies with our new requirement.[113] We agree with the Online Lenders Alliance that this implementation period will help mitigate some challenges to

---

[108] Joint Consumer Commenters Dec. 1 *ex parte* at 2.

[109] *Id.*

[110] *See, e.g.*, QuinStreet Aug. 30 *ex parte* at 2 (contending that the likely result would be that one or two large advertisers would come to dominate the online search results for products and services).

[111] Joint Consumer Commenters Dec. 1 *ex parte* at 5.

[112] *Id.*

[113] This period for implementation will be 12 months following Federal Register publication of this Report and Order or 30 days after announcement in the Federal Register of the Paperwork Reduction Act approval of the information collection in this new rule, whichever is later. The Consumer and Governmental Affairs Bureau will announce the effective date for section 64.1200(f)(9) by Public Notice. OLA had requested a 12 to 18 month implementation period. Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 2 (Dec. 4, 2023) (OLA Dec. 4 *ex parte*).

**Federal Communications Commission**                          **FCC 23-107**

implementation of our new rules[114] and we believe that such period should provide both lead generators and the callers who rely on the leads they generate ample time to implement our new requirements.[115]

47.  *Further Efforts to Assist Small Businesses.*  We recognize that, as some parties assert, a one-to-one consent requirement may impact some business models more than others.[116]  We are particularly cognizant of the Small Business Administration's request that the Commission obtain further comment and conduct further economic analysis on the impact of this proposal on small entities.[117]  We observe that no party objecting to our proposal provided specific evidence on the potential economic impact of our proposal and that our own analysis suggests that the harm of unwanted and illegal calls is at least $13.5 billion annually.[118]  Additionally, the evidence in the record indicates that lead generators and lead aggregators are a significant contributor to this problem.[119]

48.  We will continue to monitor the impact that our rule has on small businesses.  In the accompanying *Second Further Notice*, we seek comment on ways that the Commission may continue to refine our one-to-one consent rule to further mitigate any burdens it may create for businesses, especially small businesses.  Additionally, we delegate to the Consumer and Governmental Affairs Bureau to conduct outreach and education focusing on compliance with our rules for small business lead generators as well as for small business lead buyers.

49.  *Burden of Proof for Valid Consent.*  We take this opportunity to reiterate that the TCPA and our existing rules already place the burden of proof on the texter or caller to prove that they have obtained consent that satisfies federal laws and regulations.[120]  They may not, for example, rely on comparison websites or other types of lead generators to retain proof of consent for calls the seller makes.  And, in all cases, the consent must be from the consumer.  "Fake leads" that fabricate consumer consent do not satisfy the TCPA or our rules.[121]  In addition, the consumer's consent is not transferrable or subject to sale to another caller because it must be given by the consumer to the seller.[122]

50.  *Relationship to ACA Declaratory Ruling.*  We find that the rule we adopt today does not

---

[114] OLA Dec. 4 *ex parte* at 2.

[115] We are not adopting LendingTree's proposal to postpone adoption of the new rule and "act incrementally to ensure that a one-to-one rule does not harm consumers or businesses."  LendingTree Dec. 6 *ex parte*, attach. at 10.  The extended implementation period we adopt should be sufficient for smaller entities to comply with our rules.

[116] *See, e.g.*, REACH Sept. 20 *ex parte* at 2 (while "big tech" may be able to profit from one-to-one consent and an end to consent transfers, small players will not be able to—there is simply no alternative to the leads they rely on); EXP Realty *ex parte* at 1-2 (explaining that real estate agents rely on online sources and leads; although, no information was provided in this *ex parte* that the real estate agents are engaging in marketing practices that require TCPA consent or if it would be burdensome for them to obtain one-to-one consent, if required.); ABA Nov. 30 *ex parte* at 3 (arguing that the proposal could harm consumers by making it more burdensome to use comparison□shopping websites); IMC Dec. 6 *ex parte* at 3 (contending that there would be a serious impact on small businesses).

[117] SBA Dec. 1 *ex parte* at 2.

[118] *See* section III F for a discussion of benefits and costs.

[119] *See, e.g.*, USTelecom Comments at 4; Joint Consumer Commenters at 4 & Reply at 8.

[120] *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 7989-7990, para. 47.

[121] *See, e.g.*, Dobronski Comments at 3-10; Joint Consumer Commenters at 2-6 & Reply at 7-12; State Attorneys General Reply at 2-5; USTelecom Comments at 2; Letter from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 02-278 and 21-402, at 10-11 (May 15, 2023) (ZipDX May 15 *ex parte*).

[122] Section 64.1200(f)(9) provides that prior express written consent for a call or text message must be directly to one individual seller at a time.  Consumer consent to be contacted by one seller is not consent to be contacted by another seller who purchased the lead from the first seller.

upset the precedent established in our *ACA Declaratory Ruling*. In the *ACA Declaratory Ruling*, the Commission determined that "the provision of a cell phone number to a creditor . . . reasonably evidences prior express consent by the cell phone subscriber to be contacted at that number regarding the debt."[123] The Commission emphasized that such consent would be deemed granted "only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."[124]

51. Further, the Commission concluded that the creditor would be responsible for demonstrating that the consumer had provided consent because the "creditors are in the best position to have records kept in the usual course of business showing such consent, such as purchase agreements, sales slips, and credit applications."[125] Therefore, "[c]alls placed by a third-party collector *on behalf of* that creditor are treated as if the creditor itself placed the call."[126] In other words, the *ACA Declaratory Ruling* concerned calls regarding a specific transaction for which calls would be related solely to that specific transaction. The Commission determined that calls made *on behalf of* the creditor would be treated as if they were placed by the creditor itself because the creditor would have kept the best records of consent related to that specific transaction.

52. By contrast, the rule we adopt today for prior express written consent concerns the precursor to a transaction. We therefore disagree with LendingTree that the revised TCPA prior express written consent requirement is inconsistent with the *ACA Declaratory Ruling*.[127] That is, the lead generator is not otherwise engaged in business with the consumer for which another entity is calling on behalf of the lead generator, in the way that a creditor and third-party collector calling on behalf of the creditor were in the *ACA Declaratory Ruling*. Rather, the lead generator is merely facilitating consent for another business to engage in marketing of a potential future specific transaction with the called party. Because the calling party has not engaged in a specific transaction on which to base its consent, we find that our rule—and specifically, placing the burden on the caller—is consistent with the *ACA Declaratory Ruling* as well as other Commission precedent.[128]

---

[123] *Rules and Regulations Implementing the Telephone Consumer Protection Act Of 1991, Request of ACA International for Clarification and Declaratory Ruling*, Declaratory Ruling, 23 FCC Rcd 559, 564, para. 9 (2008) (*ACA Declaratory Ruling*).

[124] *Id.* at 564-65, para. 10.

[125] *Id.* at 565, para. 10.

[126] *Id*.

[127] LendingTree Dec. 6 *ex parte*, attach. at 9. We also disagree with LendingTree that the rule we adopt here undermines the TCPA exemption for calls subject to the Health Insurance Portability and Accountability Act of 1996 (HIPAA), that may be made without the prior express written consent of the called party. In the *2015 TCPA Declaratory Ruling and Order*, the Commission explained that that provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls subject to HIPAA by a HIPAA-covered entity and business associates acting on its behalf, as defined by HIPAA, if the covered entities and business associates are making calls within the scope of the consent given, and absent instructions to the contrary. *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8029, para. 141. The HIPPA exemption is, for example. for calls for which there is exigency and that have a healthcare treatment purpose, such as appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions. *2015 TCPA Declaratory Ruling and Order*, 30 FCC Rcd at 8028-32, paras. 140-148. Neither the *ACA Declaratory Ruling* situation nor the HIPAA exemption are for marketing calls to prospective customers, but are for calls made on behalf of the creditor or health care entity.

[128] *See, e.g., GroupMe, Inc./Skype Communications S.A.R.L Petition For Expedited Declaratory Ruling, Rules and Regulations Implementing the Telephone Consumer Protection Act Of 1991*, CG Docket No. 02-278, Declaratory Ruling, 29 FCC Rcd 3442, 3446, para. 11 (2014) (finding that, while consent may be obtained and conveyed

(continued….)

53.     We also disagree with LendingTree that our action, in making it unequivocally clear that one-to-one consent is required for TCPA prior express written consent, is arbitrary and capricious.[129]  The Commission sought comment on this issue, i.e., "Public Knowledge's request that prior express consent to receive calls or texts must be made directly to one entity at a time" in *Further Notice*.[130]  The Commission specifically discussed the issue of hyperlinks in a comparison shopping website, and illustrated the problem by describing Assurance IQ, a website that purports to enable consumers to comparison shop for insurance.[131]  The Assurance IQ site sought consumer consent for calls and texts from insurance companies and other various entities, including Assurance IQ's "partner companies," that were listed when accessing a hyperlink on the page seeking consent (i.e., they were not displayed on the website without clicking on the link) and included both insurance companies and other entities that did not appear to be related to insurance.[132]  The Commission also sought comment on "amending our TCPA consent requirements to require that such consent be considered granted only to callers logically and topically associated with the website that solicits consent and whose names are clearly disclosed on the same web page."[133]  Numerous commenters supported these proposals.[134]  Thus, our findings in this *Second Report and Order* are reasonably and rationally based on the issues for which the Commission sought comment and the comments filed in this proceeding.  The lead generator commenters disagree with our conclusion, but such disagreement does not mean that our conclusion is arbitrary and capricious.

### E.      Text Message Authentication and Spoofing

54.  We decline to adopt at this time caller ID authentication requirements for text.  We agree with commenters that number spoofing in the SMS/MMS domain is rare at this time and that providers that originate texts generally permit their customers to initiate those texts only from numbers for which they are the assignee.[135]

55.  In addition, several commenters observe that the wireless industry is evaluating authentication technologies that could address text-specific issues.  For example, there is active work by the Internet Engineering Task Force on text authentication standards, and ATIS's IP-NNI Task Force is exploring whether technical standards that work to enhance existing mitigations should be pursued.[136]  For these reasons, we decline to adopt caller ID authentication requirements for text messages.  We seek further comment below on the issues of number spoofing and new technical standards for caller ID authentication.

---

through an intermediary, the caller remains liable for initiating or making autodialed text messages to wireless numbers in the event consent was not actually obtained).

[129] LendingTree Nov. 30 *ex parte*.

[130] *Report and Order and Further Notice of Proposed Rulemaking* at para. 61.

[131] *Id.*

[132] *Id.*

[133] *Id.*

[134] *See, e.g.*, Joint Consumer Commenters at 2; USTelecom Comments at 2; State Attorneys General Reply at 5; Aug. 7 Congressional at 1.

[135] *See, e.g.*, CTIA Comments at 12-15; ECAC Comments at 6; M³AAWG Comments at 5; NetNumber Comments at 7; ZipDX Comments at 1; CTIA Reply at 7-9; T-Mobile Reply at 5-6 (explaining that message sender authentication is already happening and the Commission does not need to mandate a technology solution); Twilio Reply at 7-8.

[136] *See, e.g.*, INCOMPAS Comments at 5; CTIA Reply at 8-9; T-Mobile Reply at 6.

### F.    Summary of Benefits and Costs

56.    Our conservative estimate of the total loss from unwanted and illegal texts is $16.5 billion annually, which reflects both a substantial increase in the number of spam texts in recent years (the nuisance cost), and an increase in financial losses due to text scams.  We continue to estimate the nuisance cost of spam texts to be 5 cents per text.[137]  This cost is multiplied by 225.7 billion spam texts sent annually[138] and the result is $11.3 billion in total nuisance cost.  In addition, we estimate financial losses due to text scams to be $5.2 billion.  This figure is based on the $2 billion financial loss figure estimated previously,[139] scaled up to reflect the increased volume of spam texts.[140]  Our estimate is conservative; for example, Robokiller estimates the financial losses from text scams alone to be approximately $20 billion in 2022, and this figure does not include the nuisance costs of spam texts.[141]  Further, the total loss from unwanted and illegal calls is relevant for our consideration of the benefit generated by closing the lead generator loophole.  Even relying on the TrueCaller data provided by CTIA, which provides a more conservative estimate of 5.47 billion spam texts over a 12 month period, at 5 cents per text the potential nuisance cost is 273.5 million.[142]  It is unclear why CTIA considers TrueCaller a more accurate estimate than Robokiller, but even assuming the correct estimate is somewhere between TrueCaller's data and Robokiller's data, the potential loss to consumers is significant.  We reiterate the harm of unwanted and illegal calls to be at least $13.5 billion annually.[143]  We note that this is also a conservative estimate; for example, Robokiller estimates the financial losses due to robocall scams to be $33 billion for the first half of 2023.[144]

57.    We expect the actions we take today will impose minimal costs on mobile wireless providers and comparative shopping websites.  Nothing in the record demonstrates that requiring terminating providers to block texts when notified by the Commission of illegal texts would impose significant costs on mobile wireless providers.  The only argument CTIA presents for a particularly high burden is to state that wireless providers will have "to constantly check for reassigned numbers to unblock" but as we made clear above, that is not a requirement and CTIA has not adequately defined the burden they claim.[145]  Further, we expect that terminating providers aim to minimize texts that subject their customers to nuisance and receiving notifications from the Commission would assist in that effort and help providers improve customer satisfaction.  With respect to our action codifying that text messages are covered by the National DNC Registry's protections, we see no additional cost to providers.

58.    Various commenters assert consumer benefits from comparison shopping websites will be lost as a result of these rules.[146]  We note that these rules do not prohibit comparison shopping

---

[137] *Text Blocking Order and Further Notice* at para. 45.

[138] Robokiller 2022 Report at 5.

[139] *Text Blocking Order and Further Notice* at para. 45.

[140] The number of spam texts was estimated to be 86 billion when the Commission first estimated the financial harm of text scams to be $2 billion.  *Targeting and Eliminating Unlawful Text Messages*, CG Docket No. 21-402, Notice of Proposed Rulemaking, 37 FCC Rcd 11618, 11632, at paras. 43-44 (2022) (*Text Blocking NPRM*).  The Robokiller 2022 Report states that the number of spam texts has increased to 225.7 billion, as of 2022, an amount 2.62 times the original amount.  Robokiller 2022 Report at 5.

[141] Robokiller 2022 Report at 4.

[142] CTIA Dec. 4 *ex parte* at 9-10.

[143] *First Caller ID Authentication Order*, 35 FCC Rcd at 3263, paras. 47-48.

[144] Robokiller 2023 Report at 9.

[145] CTIA Dec. 4 *ex parte* at 10.  *See supra* para. 23, n.50.

[146] *See, e.g.*, LendingTree Dec. 6 *ex parte* at 2; QuinStreet Dec. 5 *ex parte* at 2; OLA Dec. 4 *ex parte* at 2.

websites, only the use of robocalls and robotexts without one-to-one consent. Nonetheless, we conclude that these commenters have not established a cost that outweighs the reduction in harm. The SBA Office of Advocacy notes that small businesses have stated that the proposal to require sellers to obtain consent to robocall or robotext from one consumer at a time could increase costs significantly for small businesses that both buy and sell sales leads.[147] The SBA did not offer any evidence to support this contention and did not address the benefit to consumers and to small businesses in having a reduction of unwanted calls and texts. This rule makes it unequivocally clear that prior express written consent under the TCPA must be to one seller at a time, but does not prevent small businesses from buying and selling leads nor does it prevent small businesses from contacting consumers. As the Joint Consumer Commenters observe, the requirements for prior express written consent for the telemarketing calls covered by the TCPA will also protect business phones from the floods of unwanted prerecorded telemarketing calls.[148] We agree with the Joint Consumer Commenters that our rule is especially helpful for small business owners who are incentivized to answer all incoming calls because each call may be from a potential customer and are unable to ignore calls from unfamiliar numbers.[149] In addition, this requirement will help small businesses because it will provide legal certainty as to how callers and texters can demonstrate valid consent when that consent was obtained via a third party.

59.     Our decision to make unequivocally clear that prior express written consent under the TCPA must be one-to-one consent may raise costs for some businesses that use robocalling, including those that fall under the definition of small businesses.[150] No party has presented any specific data to substantiate such possible additional costs. Further, the benefits of making it unequivocally clear that one-to-one consent is required for prior express written consent under the TCPA, will accrue to millions of individuals and businesses, including small businesses, and will outweigh any such costs to those businesses currently using multi-party "consent" for robocalls and robotexts. Over time, it may be possible for technological solutions to lower the costs to businesses that use robocalls or robotexts for seeking one-to-one prior express written consent, and maintaining consent records. Any effort to create an exception for particular businesses, including small businesses, has the potential to undermine the effectiveness and intent of the policy, which is to provide consumers (including small businesses) the ability to determine when and how they are contacted in a transparent manner.

60. We also see very little cost to providers as a result of our encouragement to make email-to-text an opt-in service. Providers who do not take up this option will incur no additional cost and, for those providers who do so, we assume that the benefits of making email-to-text an opt-in service, e.g., more satisfied customers, outweighs the costs of setting up an opt-in program and marketing it to their subscribers. Similarly, we believe closing the lead generator loophole so that prior express written consent can only be given directly from a consumer to a single seller-caller at a time will result in only small additional costs for comparative shopping websites. Such practices should lead to greater customer satisfaction that may benefit such websites.

61. Based on the analysis of the anticipated benefits and costs discussed above, we believe the benefits of the rules adopted in this Report and Order significantly outweigh their costs. Even if these rules eliminate only a small share of unwanted and illegal texts and calls, the benefits would be substantial, given the magnitude of the likely losses from such texts and calls.

---

[147] SBA *ex parte* at 2.

[148] Joint Consumer Commenters Dec. 1 *ex parte* at 2.

[149] *Id*.

[150] The TCPA generally requires callers to get consumer consent before making certain calls to consumers using an "automatic telephone dialing system" (also known as an "autodialer") or an artificial or prerecorded voice. 47 U.S.C. § 227(b)(1)(A).

### G.    Legal Authority

62.    We rely on the TCPA to adopt rules applicable to mobile wireless text messaging providers,[151] including our blocking requirement.  First, the TCPA gives the Commission authority over the unsolicited text messages within the scope of this order.[152]  The TCPA, in relevant part, restricts certain autodialed calls to wireless telephone numbers absent the prior express consent of the called party.[153]  The Commission has found that, for the purposes of the TCPA, texts are included in the term "call."[154]  Because the Commission has authority to regulate certain text messages under the TCPA, particularly messages sent using an autodialer and without the consent of the called party, we have legal authority to require providers to block text messages violate the TCPA.  The TCPA also provides authority for our consent requirements and our codification that text messages are covered by the National DNC Registry.[155]

63.    We therefore disagree with RILA that we do not have the legal authority to expand the DNC restrictions to text messages because Congress did not include text messages in the statute and no appellate court has construed the National DNC Registry's restrictions to include text messages.[156]  The DNC restrictions have long applied to wireless phones[157] and the Commission and courts have long held that text messages are calls under the TCPA.[158]  Further, we are codifying that text messages are included in the National DNC Registry's protections—a position that the Commission and several courts have previously taken[159]—we are not expanding the National DNC Registry's restrictions.

64.    To the extent that the Commission may direct providers to block texts where an autodialer has not been used, we further find authority under section 251(e)(1) of the Communications Act.  Section 251(e)(1) provides us independent jurisdiction to prevent the abuse of NANP resources, regardless of the classification of text messaging.[160]  Requiring blocking of a particular number that has

---

[151] CTIA specifically supported use of the TCPA, as well as the Truth-in-Caller ID Act for this purpose.  CTIA Comments at 11-12.

[152] The Commission stated in the *2003 TCPA Order* that the authority to regulate telemarketing derives from the TCPA.  *2003 TCPA Order*, 18 FCC Rcd at 14070, para. 95.  The Commission also observed that Congress anticipated "that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id*. at 14092, para. 132.

[153] 47 U.S.C. § 227(b)(1)(A).

[154] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165.

[155] 47 U.S.C. § 227(c) (granting the Commission rulemaking authority to protect residential telephone subscribers' privacy rights).

[156] RILA Reply at 5-8.

[157] *See* 47 CFR § 64.1200(e); *2003 TCPA Order*, 18 FCC Rcd at 14115-16, paras. 165-66.

[158] *2003 TCPA Order*, 18 FCC Rcd at 14115, para. 165; *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)."); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA.").

[159] *See, e.g., Hernandez*, 33 FCC Rcd at 12386, para. 10; *Barton*, 525 F. Supp.3d 195; *Mantha*, 2022 WL 325722; *Visco v. Creditors Relief, LLC*, No. 20-cv-12303-DJC, 2022 WL 488495 (D. Mass. Feb. 17, 2022); *Eagle v. GVG Capital, LLC*, No. 22-cv-00638-SRB, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023); *Pariseau v. Built USA, LLC*, 619 F. Supp.3d 1203 (M.D. Fla. 2022); *Sagar*, 2021 WL 5567408; *Hall*, 72 F.4th at 986.

[160] *See May 2023 Call Blocking Order* at para. 66.  There, the Commission noted that "this particularly applies where callers spoof caller ID for fraudulent purposes and therefore exploit numbering resources, *regardless of whether the voice service provider is a common carrier*."  *Id*. (emphasis added).  While the Commission

(continued….)

sent known illegal texts will help ensure that entities sending illegal texts cannot continue to abuse NANP resources to further their illegal schemes. We therefore disagree with CTIA, which has argued that reliance on section 251(e) "would raise unnecessary questions about the scope of the Commission's authority, given that text messaging is an information service."[161] We also find each of the other arguments raised by CTIA to be unpersuasive. First, CTIA asserts that the Commission "has never used Section 251(e) without a direct nexus to voice calls" and that the "FCC and courts have understood that numbering administration authority under Section 251(e) pertains only to numbers used for routing of voice calls in the U.S., not numbers used for text messaging."[162] The fact that Commission has not previously exercised its authority under section 251(e)(1) to address similar issues in texting does not limit our authority under that section. Furthermore, the fact that the court cases cited by CTIA pertained to voice calls merely reflects that those cases involved voice calls and pre-dated the widespread use of texting, nothing more. Second, CTIA asserts that "Section 251(e) authority is limited to services that connect with the public switched telephone network."[163] Although NANP numbers are used for routing calls on the public switched telephone network (PSTN), the authority granted in section 251(e)(1) is not restricted to voice calls routed via the PSTN.[164] Rather, section 251(e)(1) is a clear grant of authority "over those portions of the North American Numbering Plan that pertain to the United States"[165] and the underlying technology does not change the fact that the numbers in question are portions of the NANP that pertain to the United States. We further disagree that section 251(e)(1) "is also inapplicable because problems with illegal text messages are not numbering problems."[166] Here, we exercise our section 251(e)(1) authority to prevent the abuse of NANP resources by sending illegal texts, regardless of whether the number is spoofed.[167] This is consistent with our approach in calling, where we have found that our authority under this section does not hinge on whether a call is spoofed.[168] CTIA further asserts that we do not spell out what authority outside of the TCPA we may rely on when determining that a text is illegal.[169] The specific reason for a text to be illegal will vary on a case-by-case basis and, as with calls, may be based on violation of any number of state or federal

---

stated that section 251(e) "particularly applies" where numbers are spoofed, it did not find that the authority in section 251(e) was limited to spoofing, and we find no reason to construe section 251(e)(1) in that manner.

[161] CTIA Comments at n. 37; *see also* CTIA Dec. 4 *ex parte* at 6-8.

[162] CTIA Dec. 4 *ex parte* at 7 (citing *New York v. FCC*, 267 F.3d 91 (2d Cir. 2001) and *Sprint Corp. v. FCC*, 331 F.3d 952 (D.C. Cir. 2003)).

[163] CTIA Dec. 4 *ex parte* at 7.

[164] As CTIA notes, "text messages may be routed using ten-digit NANPA [sic] numbers." CTIA Dec. 4 *ex parte* at 7. We note that the paragraph of the 2021 order cited by NTIA for support was discussing whether to require cost sharing under section 251(e)(2). *See id.* (citing *Implementation of the National Suicide Hotline Improvement Act of 2018*, WC Docket No. 18-366, Second Report and Order, 36 FCC Rcd 16901, 16930, n.211 (2011). That order did not discuss the Commission's authority under section 251(e)(1).

[165] 47 U.S.C. § 251(e)(1).

[166] CTIA Dec. 4 *ex parte* at 8. This argument is inconsistent with CTIA's own suggestion that we rely on the Truth in Caller ID Act. CTIA Dec. 4 *ex parte* at 6-8. If section 251(e)(1), which does not address spoofing on its face, is inapplicable because spoofing is rare in texting, then the Truth in Caller ID Act, which is expressly about misleading or fraudulent caller ID, would also be inapplicable in most cases.

[167] This is distinct from the blocking the Commission required in the *Text Blocking Order and Further Notice*. There, the Commission required blocking of numbers that should never be used to originate calls. *Text Blocking Order and Further Notice* at paras. 16-26. In such cases, the likelihood the numbers is spoofed is high, even if spoofing is generally rare in text messaging. The blocking rule we adopt today, however, addresses situations where the sender has the right to use the number, but is using it to send illegal texts. *Supra* paras. 16-25.

[168] *See, e.g., May 2023 Call Blocking Order* at para. 66.

[169] CTIA Dec. 4 *ex parte* at 6-7.

statutes.[170]  That fact in no way diminishes our authority to rely on section 251(e)(1) to prevent the abuse of NANP resources by robotexters.

65.  We also find that we have authority under Title III of the Act to adopt these measures. Title III "endow[s] the Commission with 'expansive powers' and a 'comprehensive mandate to "encourage the larger and more effective use of radio in the public interest."'[171]  Section 303 of the Act grants the Commission authority to establish operational obligations for licensees that further the goals and requirements of the Act if such obligations are necessary for the "public convenience, interest, or necessity" and are not inconsistent with other provisions of law.[172]  In particular, section 303(b) authorizes the Commission to "[p]rescribe the nature of the service to be rendered by each class of licensed stations and each station within each class," and that is what our notice requirement and blocking rule addresses here.[173]  In addition, sections 307 and 316 of the Act allow the Commission to authorize the issuance of licenses or adopt new conditions on existing licenses if such actions will promote public interest, convenience, and necessity.[174]  We find the requirements we adopt for mobile wireless providers after they are on notice of illegal text messages are necessary to protect the public from illegal text messages and that such a requirement is in the public interest.

66.  Because we find that the sources of authority identified above provide sufficient authority for the rules we adopt today, we find it unnecessary to address other possible sources of authority to adopt these rules.

## IV.    SECOND FURTHER NOTICE OF PROPOSED RULEMAKING

67.  Because bad actors continue to evolve in their methods of defrauding consumers, in this Second Further Notice of Proposed Rulemaking, we seek comment on a number of additional steps to better protect consumers from unwanted and illegal texts.  First, we seek comment on additional blocking requirements and related approaches.  Second, we seek further comment on text message authentication.  Finally, we seek comment on whether to make email-to-text an opt-in service.

### A.    Text Blocking

68.  We propose and seek comment on additional text blocking options to better protect consumers from illegal texts.  Specifically, we first propose and seek comment on extending the text blocking requirement we adopt in the Report and Order[175] to include originating providers, and to require all immediate downstream providers to block the texts from providers that fail to block after Commission notification.  We also seek additional comment on whether to require this blocking to be

---

[170] *See Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6868, n.7 ("Fraudulent calls may violate any of a number of state or federal statutes.  *See, e.g.*, Telemarketing Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108; Credit Card Fraud Act of 1984, 18 U.S.C. § 1029; 18 U.S.C. §§ 1343, 1344.").

[171] *Cellco Partnership v. FCC*, 700 F.3d 534, 542 (D.C. Cir. 2012) (*Cellco Partnership*) (upholding the Commission's authority under Title III to adopt data roaming rules) (quoting *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943) (*Nat'l Broad Co.*) (quoting 47 U.S.C. § 303(g)).

[172] 47 U.S.C. § 303.

[173] *See Cellco Partnership*, 700 F.3d at 543 ("Like other rules that govern Title III services, the data roaming rule merely defines the form mobile-internet service must take for those who seek a license to offer it.").  We find several other provisions of section 303 relevant here.  *See* 47 U.S.C. § 303(g) (requiring the Commission to "encourage the larger and more effective use of radio in the public interest"); *id.* § 303(r) (authorizing the Commission to "[m]ake such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act").

[174] *See* 47 U.S.C. §§ 307, 316; *see also Cellco Partnership,* 700 F.3d at 543 (recognizing section 316 as additional Title III authority for our data roaming rules).

[175] *See* 47 CFR § 64.1200(s); *supra* paras. 16-25.

based on number, source, the "substantially similar" traffic standard,[176] or some other standard.  Next we seek comment on requiring providers to block texts based on content-neutral reasonable analytics.  Third, we seek comment on traceback for text messaging, including whether to adopt a traceback response requirement for text messaging.  Fourth, we seek comment on any other rules we could adopt to effectively protect consumers from illegal texts.  Finally, we seek comment on any additional protections that may be necessary in case of erroneous blocking.

### 1.    Expanding the Mandatory Text Blocking Requirement to Originating Providers and Adding a Downstream Provider Blocking Requirement

69.    *Requiring Originating Provider Blocking*.  We propose and seek comment on extending the requirement to block following Commission notification of illegal texts to other providers generally, and originating providers specifically.  We believe that originating providers are similar to gateway or originating voice service providers in that they are the first U.S.-based provider in the text path and that applying an analogous rule to originating providers could help ensure that these providers are properly incentivized to stop illegal texts even before we send any notice.  We seek comment on this view.

70.    We seek comment on whether and, if so, how to define originating providers here.  Is the originating provider the first provider in the text path, and therefore in a similar position to a gateway or originating voice service provider?  Are there other providers in the path that are more similar to a gateway provider?  Alternatively, should we apply these rules to some other entity in the chain to better protect consumers?  The call blocking rules help hold bad-actor voice service providers responsible for the calls they allow onto the network by denying those voice service providers access to the network entirely when they have demonstrated noncompliance.  Is there a particular type of entity in the texting ecosystem that is more likely to either intentionally or negligently shield those sending illegal texts?

71.    *Blocking Standard*.  We propose to require originating providers to block all texts from a particular source following Commission notification.  We seek comment on this proposal.  Is this an appropriate standard for blocking?  How might originating providers determine the source of a particular text or texts in order to comply with this rule?  Alternatively, should we require blocking based on the number or numbers, as we do for terminating providers in the Report and Order?[177]  If so, how effective is such a requirement?  If not, should we also change the standard for terminating providers to match the standard for originating providers, or do originating providers have access to more information, making a broader requirement to block based on source appropriate?

72.    Should we limit the length of time for which blocking is required?  If so, how long should we require providers to block?  Alternatively, should we require originating and/or terminating providers to block using the "substantially similar" standard applied in our call blocking rules?[178]  We believe that texting may present concerns unique from calling that justify a different standard, or require additional guidance for compliance.  For example, while a voice service provider will not have the content of a particular call prior to that call reaching the recipient, a texting provider likely does have access to this information.  Given that, should we require that blocking be content as well as competitively-neutral?  Are there any other standards we should consider?

73.    *Blocking Process*.  We seek comment on whether the process for voice service providers should be applied here to texting.  Our current rules for call blocking lay out a detailed process that must be followed before requiring all immediate downstream providers to block all of an identified

---

[176] 47 CFR § 64.1200(n)(5), (n)(6); *see also Gateway Provider Order and Further Notice*, 37 FCC Rcd at 6897-6901, paras. 74-86; *May 2023 Call Blocking Order*, at paras. 29-48 (effective Jan. 8, 2024).

[177] *Supra* paras. 16-25.

[178] *See* 47 CFR § 64.1200(n)(5), (n)(6).

voice service provider's traffic.[179]  Is this process appropriate for the texting environment, or are the differences between texting and calling that justify modifications?  Several commenters expressed concerns about the delays inherent in this process.[180]  While the process works well for calling,[181] delays may have different consequences in the texting context.

74.  Is a delay particularly significant when dealing with texts compared to calls?  Why or why not?  If so, are there changes we could make to address this issue while still ensuring that providers are afforded sufficient due process?  For example, should we, as we do in the calling context, allow 14 days for the originating provider to investigate and respond following the Notification of Suspected Illegal Texts or should we change that time frame?  Should we establish a different docket for text blocking Orders, or use the same docket used for call blocking Orders?

### 2.      Requiring Blocking of Texts Based on Reasonable Analytics

75.  We seek comment on requiring or incentivizing providers to block texts based on reasonable analytics.  Our call blocking rules provide a safe harbor for the blocking of unwanted calls based on reasonable analytics on an opt-out basis.[182]  In addition, our call blocking rules provide a safe harbor for the blocking of calls without consumers' consent and calls that are highly likely to be illegal based on reasonable analytics.[183]  In both cases, we require that analytics are applied in a non-discriminatory, competitively neutral manner.[184]  The Commission also recently sought comment on requiring terminating voice service providers to offer opt-out blocking services for calls that are highly likely to be illegal.[185]  We have not yet addressed text blocking based on reasonable analytics.

76.  *Blocking Standard*.  We seek comment on whether and how to define reasonable analytics for this purpose.  The record indicates that many providers already make use of analytics or other techniques to block illegal texts.[186]  What analytics do providers use to identify unwanted or illegal texts?  If providers are reluctant to share specifics to avoid tipping off bad actors we seek comment on broad criteria that providers may use.  For example, a call-blocking program might block calls based on a combination of factors, such as: large bursts of calls in a short timeframe, low average call duration, low call completion ratios, invalid numbers placing a large volume of calls, etc.[187]

77.  We seek comment on whether, and to what extent, providers use volumetric triggers to identify bad traffic.  Do any of the call-blocking reasonable analytics factors apply to text and, if so, which ones?  Are there other content-neutral factors that are more likely to indicate that a text is illegal that do not apply in the calling context?  If we adopt such a rule, are there any necessary modifications

---

[179] These steps include a Notification of Suspected Illegal Traffic, time for the provider to investigate and respond, and an Initial Determination Order with additional time to respond before the Enforcement Bureau may adopt a Final Determination Order requiring all immediate downstream providers to block.  47 CFR § 64.1200(n)(5)-(6).

[180] *See, e.g.*, M³AAWG Comments at 4; NetNumber Comments at 4-6 & Reply at 2-3; T-Mobile Reply at 3-4.

[181] *See, e.g.*, *One Eye*; *see also Urth Access*, *Sumco Forfeiture Order*.

[182] 47 CFR § 64.1200(k)(3).

[183] 47 CFR § 64.1200(k)(11).

[184] *See* 47 CFR § 64.1200(k)(3)(iv), (k)(11)(v).

[185] *May 2023 Call Blocking Order*, at paras. 71-75.

[186] *See, e.g.*, CTIA Comments at 7-8; M³AAWG Comments at 4; NetNumber Reply at 3; Twilio Reply at 3-6.  CTIA explains that considerations involved in investigating and blocking potentially illegal messages are different from those involved in imposing similar obligations on international gateway voice providers, for a variety of reasons, including the ever-evolving tactics used by bad actors to send spam text messages (e.g., brand impersonation, SIM boxes, snowshoe messaging, etc.).  CTIA Comments at 10.

[187] *See 2019 Call Blocking Declaratory Ruling*, 34 FCC Rcd at 4888, para. 35.

we should make to accommodate small businesses?  As we noted above, the content of a text is available to the provider at the time that blocking occurs, which is not generally true for calls.[188]  If we require providers to block based on reasonable analytics, should we therefore require that these analytics be content-neutral?  Should we also require that the blocking be non-discriminatory and competitively neutral?  Alternatively, are there ways we could encourage this blocking without requiring it?  Are there any other issues we should consider?

78.  *Safe Harbor*.  Because texting is currently classified as an information service, we do not believe that providers need safe harbor protections to engage in this type of blocking.  We seek comment on this belief.  Do providers risk liability when they block erroneously?  If so, what can we do to reduce that risk while still ensuring that wanted, lawful texts reach consumers?

### 3.    Alternative Approaches

79.  We seek comment on alternative blocking or mitigation rules we could adopt to target unwanted and illegal texts and better protect consumers.  Are there approaches we have not considered here that would stop illegal texts and protect consumers?  What can the Commission do to encourage or require providers to adopt these approaches?  For example, can the Commission take steps to encourage information sharing between providers?

### 4.    Protections Against Erroneous Blocking

80.  If we adopt additional text blocking requirements, should we also adopt additional protections against erroneous text blocking?  Our rules already require providers to provide a point of contact for blocking issues.[189]  Considering that providers can and do block texts, is this sufficient, or are other protections necessary?  If so, what protections should we adopt?  For example, should we do as one commenter suggests and create a white list for "legitimate research organizations and/or research campaigns"[190] or other entities, or would doing so raise legal or policy concerns?  Similarly, should we require some form of notification when texts are blocked,[191] similar to our requirement when calls are blocked based on reasonable analytics?  If so, how can providers send a notification technically?  Should we require notification only to certain categories of blocking?  Or, should we, as one commenter suggests, require providers to give "advance notice when a number is flagged as suspicious and may be blocked" along with several other protections?[192]  Alternatively, should we adopt the same protections already in place for erroneous blocking of calls?[193]  What are the risks and benefits of each approach?

### B.    Text Message Authentication

81.  We seek additional comment on text message authentication and spoofing.  We have so far declined to adopt authentication requirements for texting.[194]  The record thus far is mixed on the feasibility of such a requirement, with commenters noting that the STIR/SHAKEN caller ID

---

[188] *See supra* para. 72.

[189] 47 CFR § 64.1200(r).

[190] AAPOR Comments at 3-5.

[191] *See, e.g.*, CCA Comments at 5; INCOMPAS Comments at 4; RMAI Comments at 3; Bankers Joint Commenters Reply at 12-13.

[192] RMAI Comments at 3.

[193] ABA Nov. 30 *ex parte* at 2.

[194] *See Text Blocking Order and Further Notice*, at para. 37; *supra* paras. 44-45.

authentication system is designed to work only on IP networks.[195]  Further, the record indicates that number spoofing is comparatively rare in SMS and MMS.[196]

82.  We believe it is important to continue to build a record on these issues and ensure that we are aware of any new developments or concerns.  We therefore seek further comment on the need for and feasibility of text authentication.  In particular, commenters should address whether number spoofing is an issue in text messaging and, if so, the extent of the problem.  If number spoofing is uncommon, are there steps we can take to ensure that it remains the exception rather than the rule?  Do bad actors use other spoofing techniques, such as identity spoofing?  If so, what can we do to address this problem?  Commenters should also discuss any new or in-process technical standards for authentication in text messaging, including their current status and any timelines for development.  What issues will these new tools address?  If the new technical standards are designed to prevent number spoofing, is this evidence of a more significant spoofing issue than commenters[197] acknowledged in response to the *Further Notice*?  If so, should the Commission act more quickly in this area, rather than waiting for the standards bodies to finish their work?

83.  We seek comment on whether we should require industry to regularly update us with its progress on text authentication.  We believe doing so would ensure that we have the most up-to-date information available without having to adopt further Notices of Proposed Rulemaking covering this topic.  Is this belief correct?  If so, how often should we require industry to update us and how should we determine when further updates are no longer required?  For example, should we set a six-month cycle for updates over the next two years?  Or should we require some other update cycle and endpoint?

### C.     Traceback

84.  Traceback has been a key part of our strategy for combating illegal calls.[198]  We seek comment on whether we should require a response to traceback requests for texting.  We seek comment on requiring providers to respond to traceback requests from the Commission, civil or criminal law enforcement within 24 hours, consistent with our existing rule for gateway voice service providers and our recently adopted rule for all voice service providers that will take effect in January 8, 2024.[199]  Should we also include the industry traceback consortium as an entity authorized to conduct traceback of texts, or is there some other entity that should be included?  Is traceback for texting similar enough to traceback for calls for such a requirement to be effective?  Are there any changes we should make to the rule to ensure that traceback works for texts?  How should we handle aggregators and cloud platforms?  Are there industry efforts that are already in operation, such as CTIA's Secure Messaging Initiative, that could replace or complement a traceback requirement?[200]  Are there other issues we should consider in adopting a traceback requirement?

85.  We seek comment on the specifics of the traceback process for texts, as well as any obstacles to industry-led traceback efforts that may work alongside or in place of rules we may establish.  Are tracebacks typically conducted for texting?  If so, what does the process look like?  Are there types of providers that are routinely reluctant to respond to these requests?  Is information from

---

[195] *Text Blocking Order and Further Notice* at para. 37 & note 107.

[196] *See, e.g.*, ECAC Comments at 6; M³AAWG Comments at 5; NetNumber Reply at 6-8; ZipDX Comments at 1; Twilio Reply at 7-8.

[197] Such commenters argue that number spoofing in the text message domain is comparatively rare.  *See, e.g.*, ZipDX Comments at 1-2; CTIA Comments at 12-14 & Reply at 7-8; M³AAWG Comments at 5; ECAC Comments at 6; NetNumber Comments at 7; Twilio Reply at 7-8.

[198] 47 CFR § 64.1200(n)(1).

[199] *Id.*

[200] CTIA Dec. 4 *ex parte* at 10-11.

traceback processes shared and then incorporated into blocking decisions? Are there network modifications, standards, or changes to software or hardware that would enable efficient texting traceback? If we adopt a traceback requirement for texting, are there any necessary modifications we should make to accommodate small business? Is there anything else we should know about traceback for texting?

### D.    E-Mail-To-Text Messages

86. In the Order, we encourage providers to make email-to-text an opt in service. We now propose to require providers to do so, so that subscribers wishing to receive these types of messages would first have to opt in to the service.[201] Would such a rule reduce the quantity of fraudulent text messages consumers receive? Does the anonymity of email-to-text make it more attractive to fraudulent texters? Commenters should discuss any drawbacks to requiring providers to block such messages if the consumer has not opted in to such service. For example, would this result in blocking important or urgent messages? If so, how could we reduce this risk? Are there alternatives to making this service opt in that would have a similar effect? If so, what are they and how would they compare? Commenters should discuss how we should define "email-to-text service." Are there analogous services that should be covered, e.g., voicemail-to-text? We seek comment on the details of any opt-in requirement and if the opt-in should be in writing. Must it be stand-alone and conspicuous? Will providers have the burden of demonstrating opt-in decisions? Are there any other issues we should consider in adopting a rule?

### E.    Further Efforts to Assist Small Businesses with Compliance

87. We seek further comment on how the Commission can refine and expand its efforts to assist businesses, particularly small businesses, in complying with our one-to-one consent requirement. In the *Further Notice*, the Commission sought comment on how our proposal might affect the value of comparison-shopping websites to consumers and whether there were alternatives to our proposals.[202] As explained in the *Order*, we have determined based on the record that prior express written consent required under the TCPA must be given to one seller at a time.[203] The Order recognizes, however, some commenters' concerns that this requirement will increase costs or otherwise disadvantage small business lead generators and/or small business lead buyers.[204] We, therefore, are committed to monitoring the impact that our rule has on these businesses and to assisting small businesses with complying with the one-to-one consent rule.[205] We seek comment on whether and how the Commission can further minimize any potential economic impact on small businesses in complying with our one-to-one consent requirement for prior express written consent under the TCPA. Are there ways to further clarify or refine this requirement to further minimize any compliance costs? What impact would such refinements have on consumers? Are there further outreach efforts or other ways the Commission can assist small businesses in complying with our one-to-one consent rule?

---

[201] Commenters state that the email-to-text messages process allows the sender to be anonymous because the text is sent from an email account on a computer, not a phone number. ZipDX Comments at 2; Somos Reply at 5 (observing a spike in text impersonation scams originating from email-to-text gateways, which permit a message to appear as sent from someone else's number or from an email address, and stating they are an increasingly popular method for scammers to impersonate brands using the text messaging channel).

[202] *Text Blocking Report and Order and Further Notice* at para. 61.

[203] *See supra* paras. 30-53.

[204] *See supra* paras. 38, 42..

[205] *See supra* para. 48

F.        **Benefits and Costs**

88.    We estimate that the total harm of unwanted and illegal texts is at least $16.5 billion.  As discussed in the Order,[206] Robokiller estimates that Americans received 225.7 billion spam texts in 2022.[207]  Assuming a nuisance harm of 5 cents per spam text, we estimate total nuisance harm to be $11.3 billion (i.e., 5 cents multiplied by 225.7 billion spam texts).  Further, we estimate that an additional $5.3 billion of harm occurs annually due to fraud.  Previously, we estimated the harm due to fraud from scam texts at $2 billion.[208]  In the Order, we revised this figure upward in proportion with the increase in spam texts, resulting in an estimate of $5.3 billion.[209]  We believe this estimate is conservative, given that Robokiller estimates financial losses due to fraud through text messaging to be $20 billion, and this figure does not include the nuisance costs of spam texts.[210]  We seek comment on these estimates of harm and on the costs of the proposals to reduce the harm of unwanted and illegal texts outlined in this FNPRM.  The Commission will analyze any detailed cost data received in comments.

G.        **Digital Equity and Inclusion**

89.    The Commission, as part of its continuing effort to advance digital equity for all,[211] including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality, invites comment on any equity-related considerations[212] and benefits (if any) that may be associated with the proposals and issues discussed herein.  Specifically, we seek comment on how our proposals may promote or inhibit advances in diversity, equity, inclusion, and accessibility.

H.        **Legal Authority**

90.    In the Second Further Notice of Proposed Rulemaking, we seek comment on several issues: (i) additional blocking requirements and related approaches to protect consumers from illegal texts; (ii) text message authentication; and (iii) whether to make email-to-text an opt-in service.  We seek comment on our authority to adopt each of these three measures.  The Commission has authority to regulate certain text messages under the TCPA, particularly with regard to messages sent using an autodialer and without the consent of the called party.  We seek comment on whether we have legal authority to adopt rules addressing these issues under the TCPA or the TRACED Act.  For example, is

---

[206] *See supra* para. 56.

[207] Robokiller 2022 Report at 5.

[208] *Text Blocking Order and Further Notice* at para 43.  *See also Text Blocking NPRM* , 37 FCC Rcd at 11632, para 44.

[209] The volume of spam texts in 2022 (225.7 billion) was 2.62 times the previous annual amount (86 billion per year).  Our calculation scales up the $2 billion fraud harm by this factor, resulting in an estimated harm of $5.3 billion.

[210] Robokiller 2022 Report at 4.

[211] Section 1 of the Communications Act provides that the FCC "regulat[es] interstate and foreign commerce in communication by wire and radio so as to make [such service] available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex." 47 U.S.C. § 151.

[212] We define the term "equity" consistent with Executive Order 13985 as the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as Black, Latino, and Indigenous and Native American persons, Asian Americans and Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons with disabilities; persons who live in rural areas; and persons otherwise adversely affected by persistent poverty or inequality.  *See* Exec. Order No. 13985, 86 Fed. Reg. 7009, Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government (Jan. 20, 2021).

**Federal Communications Commission**                                        FCC 23-107

our TCPA jurisdiction sufficient to support our blocking proposals, and does the TRACED Act provide us with additional authority to adopt these rules?

91.    Similarly, does the TCPA grant us sufficient authority to adopt the rules we discuss regarding requiring email-to-text to be an opt-out service?  Commenters should also discuss whether we have authority for our proposals under section 251(e) of the Act, which provides us "exclusive jurisdiction over those portions of the North American Numbering Plan that pertain to the United States,"[213] particularly to adopt any authentication, traceback, or blocking requirements.  The Commission found authority to implement STIR/SHAKEN for voice service providers under section 251(e) of the Act in order to prevent the fraudulent exploitation of numbering resources.[214]  Does section 251(e) of the Act grant us authority to adopt implementation of authentication for text messages?

92.    We seek comment on our authority under the Truth in Caller ID Act for these proposals.  The Commission found that it has authority under this statute to adopt a blocking requirement in the *Text Blocking Order and Further Notice*.[215]  The Commission also found authority under this provision to mandate STIR/SHAKEN implementation, explaining that it was "necessary to enable voice service providers to help prevent these unlawful acts and to protect voice service subscribers from scammers and bad actors."[216]  We seek comment on whether that same reasoning applies here.  We also seek comment on whether we have authority for these proposals under Title III of the Act.  Are there any other sources of authority we could rely on to adopt any of the rules we discuss in this Second Further Notice of Proposed Rulemaking?

## V.    WAIVER ORDER

93.    We adopt a waiver, *sua sponte*, for a period of 12 months, to commence on the effective date of section 64.1200(s) of the Commission's rules, specifically to allow mobile wireless providers to access the RND to determine whether a number has been permanently disconnected since the date of the illegal text described in the Notification of Illegal Texts.  We delegate authority to the Consumer and Governmental Affairs Bureau to extend the term of this waiver, if needed.  The Commission established the RND to allow callers to determine whether a telephone number has been permanently disconnected after a date certain and therefore is no longer assigned to the party the caller wants to reach.[217]  The Commission's rules require providers ensure the efficient use of telephone numbers by reassigning a telephone number to a new consumer after it is disconnected by the previous subscriber.[218]  When a number is reassigned, callers may inadvertently reach the new consumer who now has the reassigned number (and may not have consented to calls from the calling party).  To mitigate these occurrences, in the *Reassigned Numbers Report and Order*, the Commission established a single, comprehensive database to contain reassigned number information from each provider that obtains North American Numbering Plan (NANP) U.S. geographic numbers, which enables any caller to verify whether a telephone number has been reassigned before calling that number.[219]

94.    We strongly encourage providers to determine whether a number has been reassigned in order to avoid blocking lawful texts from a different source using the number.  One way to make this

---

[213] 47 U.S.C. § 251(e).

[214] *STIR/SHAKEN Order*, 35 FCC Rcd at 3260-61, para. 42.

[215] *Text Blocking Order and Further Notice*, at para. 39.

[216] *STIR/SHAKEN Order*, 35 FCC Rcd at 3262, para. 44.

[217] *See Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, 33 FCC Rcd 12024, 12029, para. 11 (2018) (*Reassigned Numbers Report and Order*).

[218] *Id.* at 12027, para. 5 (citing 47 CFR § 52.15); *see* 47 CFR § 52.15(f)(1)(ii) (addressing aging of numbers).

[219] *Reassigned Numbers Report and Order*, 33 FCC Rcd at 12031, para. 19; *see also id.* at 12033-34, paras. 24-25.

determination is through use of the RND.  However, the use of the RND in this manner is outside of the original scope of the RND and disallowed by the *Reassigned Numbers Report and Order*, which states that the RND is "available only to callers who agree in writing that the caller (and any agent acting on behalf of the caller) will use the database solely to determine whether a number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts."[220]

95.  However, when it adopted the *Reassigned Numbers Report and Order*, the Commission stated that it would address requests to access to the database for other lawful purposes through its waiver process.[221]  Under this process, the Commission may waive its rules for good cause shown.[222] Good cause for a waiver may be found if special circumstances warrant a deviation from the general rule and such deviation will serve the public interest.[223]  We find that permitting providers to access the RND for the purpose of determining if a number has been permanently disconnected after the date of an illegal text described in a Notification of Illegal Texts would prevent erroneous blocking of text messages (if the number had been reassigned) and is good cause to grant this waiver, *sua sponte*.  A subsequent user of the number that had previously been used for illegal texts should not be subject to erroneous blocking, particularly as this can be avoided by such access to the RND, and this consequent reduction in erroneous blocking would serve the public interest.  We thus find good cause for such a waiver, for accessing the RND for this purpose.

96.  We therefore adopt a waiver, *sua sponte*, for a period of 12 months, to commence on the effective date of section 64.1200(s) of the Commission's rules, specifically for accessing the RND to determine whether a number has been permanently disconnected since the date of the illegal text described in the Notification of Illegal Texts.  Providers may access the RND for this purpose in the same manner as they would to determine whether a number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts.[224]

## VI.    PROCEDURAL MATTERS

97.  *Paperwork Reduction Act*.  This document may contain new and modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. All such new or modified information collection requirements will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.  OMB, the general public, and other federal agencies will be invited to comment on any new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, see 44 U.S.C. 3506(c)(4), we previously

---

[220] *Id*. at 12034, para. 26.

[221] *See id*. at n.68.

[222] *See* 47 CFR § 1.3; *Northeast Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990).  Our rules also expressly provide that any rule may be waived by the Commission on its own motion.  *See* 47 CFR § 1.3.

[223] *See Northeast Cellular*, 897 F.2d at 1166.  Courts have recognized that the Commission may take into account considerations of hardship, equity, or more effective implementation of overall policy on an individual basis.  *See WAIT Radio v. FCC*, 418 F.2d 1153, 1159 (D.C. Cir. 1969).

[224] The certification statement for use of the RND will need to be modified to cover this use.  We anticipate that the certification would be substantially similar to "The user agrees and warrants that it, and any agent acting on its behalf, will access and use the reassigned numbers database to: 1) determine whether a number has been permanently disconnected since a date selected by the user, or its agent, for the purpose of making lawful calls or sending lawful texts.  The date selected will be a date that the user, or its agent, reasonably and in good faith believes the person it intends to call or text could be reached at that number; or 2) Determine if a number that the Commission's Enforcement Bureau has directed a provider to block has been permanently disconnected and therefore if such blocking should cease.  The date selected will be the latest date given for an illegal text from the number by the Commission's Enforcement Bureau in its Notification of Illegal Texts."

sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees. In this present document, we have assessed the effects of our requirement that providers block texts following notification from the Enforcement Bureau of fraudulent texts from a particular source. We find that, to the extent this requirement constitutes an information collection, such collection will not present a substantial burden for small business concerns with fewer than 25 employees and that any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.

98. This document may also contain proposed new or modified information collection requirements. The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and the Office of Management and Budget (OMB) to comment on any proposed information collection requirements contained in this document, as required by the Paperwork Reduction Act of 1995, Public Law 104-13. In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

99. *Regulatory Flexibility Act*. The Regulatory Flexibility Act of 1980, as amended (RFA),[225] requires that an agency prepare a regulatory flexibility analysis for notice and comment rulemakings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[226] Accordingly, we have prepared a Final Regulatory Flexibility Analysis (FRFA) concerning the impact of the rule changes contained in the Report and Order on small entities. The FRFA is set forth in Appendix D.

100. We have also prepared an Initial Regulatory Flexibility Analysis (IRFA) concerning the potential impact of the rule and policy changes contained in the *Second Further Notice of Proposed Rulemaking*. The IRFA is set forth in Appendix E. Written public comments are requested on the IRFA. Comments must be filed by the deadlines for comments on the *Second Further Notice of Proposed Rulemaking* indicated on the first page of this document and must have a separate and distinct heading designating them as responses to the IRFA.

101. *Congressional Review Act*. The Commission will submit this draft Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order to the Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, for concurrence as to whether this rule is "major" under the Congressional Review Act, 5 U.S.C. § 804(2). The Commission will send a copy of this Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order to Congress and the Government Accountability Office pursuant to 5 U.S.C. § 801(a)(1)(A).

102. *Ex Parte Rules*. The proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[227] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments

---

[225] *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. § 601, *et seq.*, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 847 (1996).

[226] 5 U.S.C. § 605(b).

[227] 47 CFR §§ 1.1200 *et seq*.

already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b) of the Commission's rules.  In proceedings governed by section 1.49(f) of the Commission's rules or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.[228]

103.    *Filing of Comments and Reply Comments*.  Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).  *See* Electronic Filing of Documents in Rulemaking Proceedings, 63 FR 24121 (1998).

• Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS: www.fcc.gov/ecfs.

• Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.

• Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

• Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first class, Express, and Priority mail must be addressed to 45 L Street NE, Washington, D.C. 20554.

• Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings.  This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19.  *See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy*, Public Notice, 35 FCC Rcd 2788 (OMD 2020).

104.    *People with Disabilities*.  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice).

105.    *Availability of Documents*.  Comments, reply comments, *ex parte* submissions, and the Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order will be available via ECFS.  Documents will be available electronically in ASCII, Microsoft Word, and/or Adobe Acrobat.  When the FCC Headquarters reopens to the public, documents will also be available for public inspection during regular business hours in the FCC Reference Center, Federal Communications Commission, 45 L Street NE, Washington, D.C. 20554.

106.    *Providing Accountability Through Transparency Act*:  The Providing Accountability Through Transparency Act requires each agency, in providing notice of a rulemaking, to post online a

---

[228] 47 CFR § 1.49(f).

brief plain-language summary of the proposed rule.[229]  Accordingly, the Commission will publish the required summary of this Second Further Notice of Proposed Rulemaking on https://www.fcc.gov/proposed-rulemakings.

107.  *Additional Information*.  For additional information on this proceeding, contact Jerusha Burnett, jerusha.burnett@fcc.gov, 202 418-0526, or Mika Savir, mika.savir@fcc.gov, 202 418-0384, both of the Consumer and Governmental Affairs Bureau, Consumer Policy Division.

## VII.    ORDERING CLAUSES

108.  Accordingly, **IT IS ORDERED**, pursuant to sections 4(i), 4(j), 227, 251(e), 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 251(e)(1), 301, 303, 307, and 316, that this Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order IS ADOPTED.

109.  **IT IS FURTHER ORDERED** that this Second Report and Order **SHALL BE EFFECTIVE** 30 days after publication in the Federal Register, except that the amendments to section 47 CFR § 64.1200(f)(9), which may contain new or modified information collection requirements, will not become effective until 12 months after publication in the Federal Register or 30 days after notice that the Office of Management and Budget has completed review of any information collection requirements that the Consumer and Governmental Affairs Bureau determines is required under the Paperwork Reduction Act, whichever is later and the amendments to 47 CFR § 64.1200(s) which shall be effective 180 days after publication in the Federal Register. The Commission directs the Consumer and Governmental Affairs Bureau to announce the effective date for section 64.1200(f)(9) by subsequent Public Notice.

110.  **IT IS FURTHER ORDERED**, that, the Commission's rule restricting access to the Reassigned Numbers Database only to callers to determine whether a number has been permanently disconnected for the purpose of making lawful calls or sending lawful texts **IS WAIVED** to the extent described in the Waiver Order (Section V) to allow mobile wireless providers to access the Reassigned Numbers Database to determine whether a number has been permanently disconnected since the date(s) of the illegal texts described in a Notification of Illegal Texts.

111.  **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Second Report and Order and Second Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.**IT IS FURTHER ORDERED** that the Office of the Managing Director, Performance Evaluation and Records Management, SHALL SEND a copy of this Second Report and Order in a report to be sent to Congress and to the Governmental Accountability Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[229] 5 U.S.C. § 553(b)(4).  The Providing Accountability Through Transparency Act, Pub. L. No. 118-9 (2023), amended section 553(b) of the Administrative Procedure Act.

**Federal Communications Commission** **FCC 23-107**

## APPENDIX A

### List of Commenters

| | Commenter | Abbreviated Name | Date Filed |
|---|---|---|---|
| 1 | American Association of Ancillary Benefits | AAAB | 5/5/23 |
| 2 | American Association for Public Opinion Research | AAPOR | 5/2/23 |
| 3 | (Anonymous) Small Business | Small Business | 4/7/23 |
| 4 | Assurance IQ, LLC | Assurance | 5/8/23 |
| 5 | Balboa Digital/Kevin Wagoner | Balboa Digital | 4/17/23 |
| 6 | Campaign Verify, Inc. | Campaign Verify | 5/8/23 |
| 7 | Chandler, Corey | Chandler | 5/8/23 |
| 8 | Competitive Carriers Association | CCA | 5/8/23 |
| 9 | Concerned Citizen | Concerned Citizen | 5/8/23 |
| 10 | Connors, James | Connors | 4/17/23 |
| 11 | Consumer Consent Council | C3 | 5/8/23 |
| 12 | CTIA —The Wireless Association® | CTIA | 5/8/23 |
| 13 | Dobronski, Mark W. | Dobronski | 5/8/23 |
| 14 | Drips Holdings, LLC | Drips | 5/8/23 |
| 15 | Earl, William J. | Earl | 5/3/23 |
| 16 | Enterprise Communications Advocacy Coalition | ECAC | 5/8/23 |
| 17 | Harvey, Brian | Harvey | 5/8/23 |
| 18 | Haskins, Hayden | Haskins | 5/8/23 |
| 19 | High Tech Forum/Richard Bennett | High Tech Forum | 4/16/23 |
| 20 | INCOMPAS | INCOMPAS | 5/8/23 |
| 21 | Insurance Marketing Coalition | IMC | 5/8/23 |
| 22 | Keller, Richard | Keller | 5/9/23 |
| 23 | LendingTree, LLC | LendingTree | 5/8/23 |

| 24 | Messaging Malware Mobile Anti-Abuse Working Group | M³AAWG | 5/4/23 |
|----|----|----|----|
| 25 | National Association of Mutual Insurance Companies/Thomas Karol | NAMIC | 5/8/23 |
| 26 | National Consumer Law Center, on behalf of its low-income clients, Electronic Privacy Information Center, Appleseed Foundation, Consumer Action, Consumer Federation of America, National Association of Consumer Advocates, National Association of State Utility Consumer Advocates, National Consumers League, Public Citizen, Public Knowledge, U.S. PIRG | Joint Consumer Commenters | 5/8/23 |
| 27 | NetNumber, Inc. | NetNumber | 5/8/23 |
| 28 | Online Lenders Alliance/Michael Day | OLA | 5/8/23 |
| 29 | Professional Association for Customer Engagement | PACE | 5/8/23 |
| 30 | Pain, Edmond and Stodolak, David | Pain and Stodolak | 5/8/23 |
| 31 | Presley, Richard | Presley | 4/11/23 |
| 32 | QuinStreet, Inc. | QuinStreet | 5/8/23 |
| 33 | Receivables Management Assoc International | RMAI | 5/8/23 |
| 34 | Responsible Enterprises Against Consumer Harassment, Mutual Benefit Corporation/Eric Troutman | REACH | 5/8/23 and 5/9/23 (amendment to comments to correct spellings, etc.) |
| 35 | Rubenstein, Mark | Rubenstein | 3/28/23 |
| 36 | Schwab, Thomas J. (filed in 02-278) | Schwab | 4/17/23 |
| 37 | Shields, Joe | Shields | 5/9/23 |
| 38 | Solar Energy Industries | SEIA | 5/8/23 |

| | | | |
|---|---|---|---|
| | Association | | |
| 39 | SolarReviews | SolarReviews | 4/19/23 |
| 40 | Subbaiah, Kelly | Subbaiah | 3/28/23 |
| 41 | UnitedHealthcare | UHC | 5/8/23 |
| 42 | USTelecom – The Broadband Association | USTelecom | 5/8/23 |
| 43 | Voice on the Net Coalition | VON | 5/8/23 |
| 44 | Williamson, Sydney | Williamson | 3/28/23 |
| 45 | ZipDX, LLC | ZipDX | 5/8/23 |

| | Reply Commenter and Ex Parte | Abbreviated name | Date Filed |
|---|---|---|---|
| 1 | 28 State Attorneys General (Steve Marshall, Alabama; Treg Taylor, Alaska; Kristin K. Mayes, Arizona; Rob Bonta, California; Philip J. Weiser, Colorado; William Tong, Connecticut; Brian L. Shwalb, District of Columbia; Kwame Raoul, Illinois; Aaron M. Frey, Maine; Anthony G. Brown, Maryland; Andrea Joy Campbell, Massachusetts; Dana Nessel, Michigan; Keith Ellison, Minnesota; Lynn Fitch, Mississippi; Matthew J. Platkin, New Jersey; Josh Stein, North Carolina; Drew H. Wrigley, North Dakota; Dave Yost, Ohio; Gentner Drummond, Oklahoma; Ellen F. Rosenblum, Oregon; Michelle A. Henry, Pennsylvania; Alan Wilson, South Carolina; Jonathan Skrmetti, Tennessee; Charity R. Clark, Vermont; Jason Miyares, Virginia; Bob Ferguson, | State Attorneys General | 6/6/23 |

**Federal Communications Commission**    **FCC 23-107**

| | | | |
|---|---|---|---|
| | Washington; Joshua L. Kaul, Wisconsin; Bridget Hill, Wyoming) | | |
| 2 | American Bankers Association, ACA International, American Financial Services Association, Bank Policy Institute, Credit Union National Association, Mortgage Bankers Association, National Association of Federally-Insured Credit Unions, National Council of Higher Education Resources, and Student Loan Servicing Alliance | Bankers Joint Commenters | 6/6/23 |
| 3 | Competitive Carriers Association | CCA | 6/6/23 |
| 4 | Connors, James | Connors | 6/7/23 |
| 5 | Contact Care Compliance | Contact Care Compliance | 5/18/23 |
| 6 | Crisp, Marcus | Crisp | 6/7/23 |
| 7 | CTIA —The Wireless Association® | CTIA | 6/6/23 |
| 8 | Dobronski, Mark | Dobronski | 6/7/23 |
| 9 | Douglas, John | Douglas | 6/6/23 |
| 10 | Insurance Marketing Coalition | IMC | 6/6/23 |
| 11 | Keller, Richard | Keller | 6/4/23 (two replies filed, one is an express comment) |
| 12 | LendingTree, LLC | LendingTree | 6/6/23 |
| 13 | Madame Mohawk | Madame Mohawk | 6/26/23 |
| 14 | National Consumer Law Center, on behalf of its low-income clients, Electronic Privacy Information Center, Appleseed Foundation, Consumer Action, Consumer Federation of America, National | Joint Consumer Commenters | 6/6/23 |

|  |  |  |  |
|---|---|---|---|
|  | Association of Consumer Advocates, National Association of State Utility Consumer Advocates, National Consumers League, Public Citizen, Public Knowledge, U.S. PIRG |  |  |
| 15 | NetNumber, Inc. | NetNumber | 6/6/23 |
| 16 | Powell, William J. | Powell | 5/9/23 |
| 17 | Email from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC (May 15, 2023) | ZipDX May 15 *ex parte* | 5/15/23 |
| 18 | Provenant | Provenant | 6/6/23 |
| 19 | Responsible Enterprises Against Consumer Harassment, Mutual Benefit Corporation/Eric Troutman | REACH | 6/5/23 |
| 20 | Retail Industry Leaders Association | RILA | 5/9/23 |
| 21 | Rural Wireless Association, Inc. | RWA | 6/6/23 |
| 22 | Shields, Joe | Shields | 6/6/23 |
| 23 | Solar Energy Industries Association | SEIA | 6/6/23 |
| 24 | Somos, Inc. | Somos | 6/6/23 |
| 25 | Subbaiah, Kelly | Subbaiah | 6/5/23 |
| 26 | T-Mobile USA, Inc. | T-Mobile | 6/6/23 |
| 27 | Twilio, Inc. | Twilio | 6/6/23 |
| 28 | Westbrook, Ken | Westbrook | 7/26/23 |
| 29 | Williams, Marjorie | Williams | 6/6/23 |
| 30 | ZipDX, LLC | ZipDX | 6/5/23 |
| 31 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (July 25, 2023) | CTIA July 25 *ex parte* | 7/25/23 |
| 32 | Letter from Scott | CTIA Aug. 2 *ex parte* | 8/2/23 |

| | Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Aug. 2, 2023) | | |
|---|---|---|---|
| 33 | Letter from United States Senators Ben Ray Luján, Edward J. Markey, Peter Welch, Chris Van Hollen, Elizabeth Warren, Angus S. King, Jr., Richard J. Durbin, Martin Heinrich, Mark R. Warren, Gary C. Peters, Ron Wyden, Amy Klobuchar, to Jessica Rosenworcel, Chairwoman, FCC (Aug. 7, 2023) | Aug. 7 Congressional | 8/7/23 |
| 34 | Letter from Missy Meggison, Co-Executive Director, Consumer Relations Consortium, to FCC (Aug. 9, 2023). | CRC Aug. 9 *ex parte* | 8/9/23 |
| 35 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Aug. 23, 2023) | CTIA Aug. 23 *ex parte* | 8/23/23 |
| 36 | Letter from Yaron Dori and Jorge Ortiz, counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC (Aug. 30 2023) | QuinStreet Aug. 30 *ex parte* | 8/30/23 |
| 37 | Letter from Steven A. Augustino and Josh Myers, counsel to LendingTree, LLC to Marlene H. Dortch, Secretary, FCC (Sept. 8, 2023) | LendingTree Sept. 8 *ex parte* | 9/8/23 |
| 38 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 15, 2023) | REACH Sept. 15 *ex parte* | 9/15/23 |
| 39 | Letter from Michael H. Pryor, Brownstein, Hyatt, | ABA Sept. 18 *ex parte* | 9/18/23 |

| | Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Sept. 18, 2023) | | |
|---|---|---|---|
| 40 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 20, 2023) | REACH Sept. 20 *ex parte* | 9/20/23 |
| 41 | Letter from Steven A. Augustino and Josh Myers, counsel to NetNumber, Inc. to Marlene H. Dortch, Secretary, FCC (Sept. 21, 2023) | NetNumber *ex parte* | 9/21/23 |
| 42 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023) | REACH Sept. 26 *ex parte* | 9/26/23 |
| 43 | Letter from David Frankel, ZipDX, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023 | ZipDX Sept. 26 *ex parte* | 9/26/23 |
| 44 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Sept. 26, 2023) | ABA Sept. 26 *ex parte* | 9/26/23 |
| 45 | Letter from Lucas Bell, Director, Government Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC (Oct. 27, 2023) | Zillow Oct. 27 *ex parte* | 10/27/23 |
| 46 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Oct. 31, 2023) | REACH Oct. 31 *ex parte* | 10/31/23 |
| 47 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC | REACH Nov. 2 *ex parte* | 11/2/23 |

| | | | |
|---|---|---|---|
| | (Nov. 2, 2023) | | |
| 48 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Nov. 9, 2023) | Credit Union National Association Nov. 9 *ex parte* | 11/9/23 |
| 49 | Letter from Michael H. Pryor, Brownstein, Hyatt, Farber, Schreck LLP, to Marlene H. Dortch, Secretary, FCC (Nov. 15, 2023) | ABA Nov. 15 *ex parte* | 11/15/23 |
| 50 | Letter from Eric J. Troutman, Counsel to EXP Realty, to Marlene H. Dortch, Secretary, FCC (Nov. 16, 2023) | EXP Realty *ex parte* | 11/16/23 |
| 51 | Letter from Eric J. Troutman, President, REACH, to Marlene H. Dortch, Secretary, FCC (Nov. 20, 2023) | REACH Nov. 20 *ex parte* | 11/20/23 |
| 52 | Email from David Frankel, ZipDX, to FCC (Nov. 29, 2023). | ZipDX Nov. 29 *ex parte* | 11/29/23 |
| 53 | Letter from Yaron Dori and Jorge Ortiz, Counsel to QuinStreet, to Marlene H. Dortch, Secretary, FCC (Nov. 30 2023) | QuinStreet Nov. 30 *ex parte* | 11/30/23 |
| 54 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Nov. 30, 2023). | LendingTree Nov. 30 *ex parte* | 11/30/23 |
| 55 | Letter from Jonathan Thessin, Vice President/Senior Counsel, American Bankers Association, to Marlene H. Dortch, Secretary, FCC (Nov. 30, 2023) | ABA Nov. 30 *ex parte* | 11/30/23 |
| 56 | Letter from Margot Saunders, National Consumer Law Center, to Marlene H. Dortch, | Joint Consumer Commenters Dec. 1 *ex parte* | 12/1/23 |

| | | | |
|---|---|---|---|
| | Secretary, FCC (Dec 1, 2023). | | |
| 57 | Letter from Major L. Clark III and Jamie Belcore Saloom, Small Business Administration Office of Advocacy, to Marlene H. Dortch, Secretary, FCC (Dec 1, 2023). | SBA Dec. 1 *ex parte* | 12/1/23 |
| 58 | Email from David Frankel, ZipDX, to FCC (Dec. 3, 2023). | ZipDX Dec. 3 *ex parte* | 12/3/23 |
| 59 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Dec. 4, 2023) | CTIA Dec. 4 *ex parte* | 12/4/23 |
| 60 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 4, 2023) | OLA Dec. 4 *ex parte* | 12/4/23 |
| 61 | Letter from Alexander H. Burke, Burke Law Offices, LLC, to Marlene H. Dortch, Secretary, FCC (Dec. 5, 2023) | Burke Dec. 5 *ex parte* | 12/5/23 |
| 62 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 5, 2023). | LendingTree Dec. 5 *ex parte* | 12/5/23 |
| 63 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023). | LendingTree Dec. 6 *ex parte* Burke Response | 12/6/23 |
| 64 | Letter from Alexandra Mays, Assistant General Counsel and Director, Regulatory Affairs, Competitive Carrier Association, to Marlene H. Dortch, Secretary, FCC | CCA Dec. 6 *ex parte* | 12/6/23 |

| | (Dec. 6, 2023) | | |
|---|---|---|---|
| 65 | Letter from Insurance Marketing Coalition to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | IMC Dec. 6 *ex parte* | 12/6/23 |
| 66 | Letter from Scott Bergmann, Senior Vice President, Regulatory Affairs, CTIA, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | CTIA Dec. 6 *ex parte* | 12/6/23 |
| 67 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023). | LendingTree Dec. 6 *ex parte* | 12/6/23 |
| 68 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 6, 2023) | OLA Dec. 6 *ex parte* | 12/6/23 |
| 69 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023) | OLA (Carr) Dec. 7 *ex parte* | 12/7/23 |
| 70 | Letter from Michael Day, Policy Director, Online Lenders Alliance, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023) | OLA (Starks) Dec. 7 *ex parte* | 12/7/23 |
| 71 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023). | LendingTree CGB Dec. 7 *ex parte* | 12/7/23 |
| 72 | Letter from Steven A. Augustino, Counsel to LendingTree, to Marlene H. Dortch, Secretary, FCC (Dec. 7, 2023). | LendingTree Dec. 7 *ex parte* | 12/7/23 |
| 73 | Letter from Luke Bell, Director, Government | Zillow Dec. 8 *ex parte* | 12/8/23 |

**Federal Communications Commission** **FCC 23-107**

| | | | |
|---|---|---|---|
| | Relations, Zillow Group, to Marlene H. Dortch, Secretary, FCC (Dec. 8, 2023) | | |
| 74 | Letter from United States Senators Thom Tillis and Marsha Blackburn to Jessica Rosenworcel, Chairwoman, FCC (Dec. 6, 2023) | Dec. 6 Congressional | 12/6/23 |

## APPENDIX B

### Final Rules

The Federal Communications Commission amends Parts 0 and 64 of Title 47 of the Code of Federal Regulations as follows:

PART 0—COMMISSION ORGANIZATION

Subpart A—Organization

1.      Amend section 0.111(a) by revising paragraph (27) to read:

(27) Identify suspected illegal calls and illegal texts and provide written notice to voice service or mobile wireless providers.  The Enforcement Bureau shall: (1) identify with as much particularity as possible the suspected traffic or texts; (2) cite the statutory or regulatory provisions the suspected traffic appear to violate or illegal texts violate; (3) provide the basis for the Enforcement Bureau's reasonable belief that the identified traffic or the determination that the illegal texts are unlawful, including any relevant nonconfidential evidence from credible sources such as the industry traceback consortium or law enforcement agencies; and (4) direct the voice service provider receiving the notice that it must comply with section 64.1200(n)(2) of the Commission's rules or direct the mobile wireless provider receiving the notice that it must comply with 64.1200(s) of the Commission's rules.

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

2. Amend § 64.1200 by revising paragraph (e) to add "or text messages," to read as follows:

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

3. Amend § 64.1200 by revising the first full paragraph of paragraph (f)(9) to read as follows:

(f)(9) The term prior express written consent means an agreement, in writing, that bears the signature of the person called or texted that clearly and conspicuously authorizes no more than one identified seller to deliver or cause to be delivered to the person called or texted advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice.  Calls and texts must be logically and topically associated with the interaction that prompted the consent and the agreement must identify the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.
(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:
(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls or texts using an automatic telephone dialing system or an artificial or prerecorded voice; and
(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.  The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

**Federal Communications Commission**                    **FCC 23-107**

4. Amend § 64.1200 by adding paragraph (s) to read as follows:

(s) A terminating mobile wireless provider must, upon receipt of a Notification of Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s), including, when required, blocking all texts from the identified number or numbers.  The Enforcement Bureau will issue a Notification of Illegal Texts that identifies the number(s) used and the date(s) the texts were sent or received; provides the basis for the Enforcement Bureau's determination that the identified texts are unlawful; cites the statutory or regulatory provisions the identified texts violate; directs the provider receiving the notice that it must comply with this section; and provide a point of contact to be used by a subscriber to a listed number to dispute blocking.  The Enforcement Bureau's Notification of Illegal Texts shall give the identified provider a reasonable amount of time to comply with the notice.  The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418 at *https://www.fcc.gov/ecfs/search/search-filings*.  The provider must include a certification that it is blocking all texts from the number or numbers and will continue to do so unless the provider learns that the number has been reassigned, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned.  If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking.  The provider is not required to monitor for number reassignments.

# APPENDIX C

## Proposed Rules

The Federal Communications Commission amends Part 64 of Title 47 of the Code of Federal Regulations as follows:

PART 64—MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

Subpart L—Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising

1.       Amend section 64.1200 by revising paragraph (s) to reread:

(s) A mobile wireless provider must:

(1) A terminating mobile wireless provider must, upon receipt of a Notification of Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s)(1), including, when required, blocking all texts from the identified number or numbers. The Enforcement Bureau will issue a Notification of Illegal Texts that identifies the number(s) used and the date(s) the texts were sent or received; provide the basis for the Enforcement Bureau's determination that the identified texts are unlawful; cite the statutory or regulatory provisions the identified texts violate; direct the provider receiving the notice that it must comply with this section; and provide a point of contact to be used by a subscriber to a listed number to dispute blocking. The Enforcement Bureau's Notification of Illegal Texts shall give the identified provider a reasonable amount of time to comply with the notice. The Enforcement Bureau shall publish the Notification of Illegal Texts in EB Docket No. 23-418 at *https://www.fcc.gov/ecfs/search/search-filings*. The provider must include a certification that it is blocking all texts from the number or numbers and will continue to do so unless the provider learns that the number has been reassigned, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned. If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking. The provider is not required to monitor for number reassignments.

(2) If an originating provider, upon receipt of a Notification of Suspected Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s)(2), including, when required, blocking all texts from  the source. The Enforcement Bureau will issue a Notification of Suspected Illegal Texts that identifies with as much particularity as possible the suspected illegal texts including the number(s) used and the date(s) the texts were sent or received; provides the basis for the Enforcement Bureau's reasonable belief that the identified texts are unlawful; cites the statutory or regulatory provisions the identified texts appear to violate; and directs the provider receiving the notice that it must comply with this section. The Enforcement Bureau's Notification of Suspected Illegal Texts shall give the identified provider a minimum of 14 days to comply with the notice. Each notified provider must promptly investigate the identified texts and report the results of that investigation to the Enforcement Bureau within the timeframe specified in the Notification of Suspected Illegal Texts.
(i) The provider must include a certification that it is blocking all texts from the source, and will continue to do so unless:
(A) the provider determines that the identified texts are not illegal, in which case it shall provide an explanation as to why the provider reasonably concluded that the identified texts are not illegal and what steps it took to reach that conclusion; or

53

(B) the provider learns that the number has been reassigned and the source cannot be otherwise identified in a content-neutral and competitively-neutral manner, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned.  If, at any time in the future, the provider determines that the number has been reassigned, it should notify the Enforcement Bureau and cease blocking unless further blocking of the source can be done in a content-neutral and competitively-neutral manner.

(ii) If an originating mobile wireless provider fails to respond to the Notification of Suspected Illegal Texts, the Enforcement Bureau determines that the response is insufficient, the Enforcement Bureau determines that the provider is continuing to originate texts from the same source that could be blocked after the timeframe specified in the Notification of Suspected Illegal Texts, or the Enforcement Bureau determines based on the evidence that the texts are illegal despite the provider's assertions, the Enforcement Bureau may issue an Initial Determination Order to the provider stating the Bureau's initial determination that the provider is not in compliance with this section.  The Initial Determination Order shall include the Enforcement Bureau's reasoning for its determination and give the provider a minimum of 14 days to provide a final response prior to the Enforcement Bureau making a final determination on whether the provider is in compliance with this section.

(1) If an originating mobile wireless provider does not provide an adequate response to the Initial Determination Order within the timeframe permitted in that Order or continues to originate texts from the same source onto the U.S. network, the Enforcement Bureau may issue a Final Determination Order finding that the provider is not in compliance with this section.  The Final Determination Order shall be published in EB Docket No. 22-174 at.  A Final Determination Order may be issued up to one year after the release date of the Initial Determination Order, and may be based on either an immediate failure to comply with this rule or a determination that the provider has failed to meet its ongoing obligation under this rule to block all texts from the identified source.

(2) When notified by the Commission through its Enforcement Bureau that a Final Determination Order has been issued finding that an originating mobile wireless provider has failed to block as required under paragraph (s)(1) of this section, block and cease accepting all texts received directly from the identified originating provider beginning 30 days after the release date of the Final Determination Order. This paragraph (s)(2) applies to any provider immediately downstream from the originating provider. The Enforcement Bureau shall provide notification by publishing the Final Determination Order in EB Docket No. 22–418 at *https://www.fcc.gov/ecfs/search/search-filings*. Providers must monitor EB Docket No. 22–174 and initiate blocking no later than 30 days from the release date of the Final Determination Order.

# APPENDIX D

## Final Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980 (RFA),[1] as amended, an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in *Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Further Notice of Proposed Rulemaking* (*FNPRM*), released March 2023.[2]  The Federal Communications Commission (Commission) sought written public comment on the proposals in the *FNPRM*, including comment on the IRFA.  The Commission received no comments in response to the IRFA.  This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[3]

### A.    Need for, and Objectives of, the Second Report and Order

2.    The *Second Report and Order* continues the Commission's efforts to stop the growing tide of unwanted and illegal texts by building on the text blocking requirements from the March 2023 *Text Blocking Order*.[4]  While mobile wireless providers voluntarily block a significant number of unwanted and illegal texts, many of these harmful texts still reach consumers.  The *Second Report and Order* requires terminating mobile wireless providers to block texts from a particular source following notification from the Commission; codifies that the National Do-Not-Call (DNC) Registry protections apply to text messages; encourages mobile service providers to make email-to-text an opt-in service; and revises our definition of prior express written consent making clear that consent must be to one seller at a time, and the seller must be logically and topically related to the content of the website on which consent is obtained.

### B.    Summary of Significant Issues Raised by Public Comments in Response to the IRFA

3.    There were no comments filed that specifically addressed the proposed rules and policies presented in the IRFA.

### C.    Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration

4.    Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the proposed rules as a result of those comments.

5.    The Chief Counsel did not file comments in response to the proposed rules in this proceeding; however, the Chief Counsel filed an *ex parte* letter on December 1, 2023.  The SBA contends that small businesses have stated that the proposal to require sellers to obtain consent to call or text from one consumer at a time could increase costs significantly for small businesses that both buy and sell sales leads.  The SBA did not offer any evidence to support this contention and did not address the benefit to consumers and to small businesses in having a reduction of unwanted calls and texts.

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Targeting and Eliminating Unlawful Text Messages, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket Nos. 02-278, 21-402, Report and Order and Further Notice of Proposed Rulemaking, FCC 23-21 (Mar. 17, 2023) (*Text Blocking Order and Further Notice*).

[3] *See* 5 U.S.C. § 604.

[4] *Text Blocking Order and Further Notice* at 7-14,-paras. 13-31.

6.    This rule makes it unequivocally clear that prior express written consent under the TCPA must be to one seller at a time, but does not prevent small businesses from buying and selling leads or prevent small businesses from contact with consumers.  The requirements for prior express written consent for the telemarketing calls covered by the TCPA will also protect business phones from the floods of unwanted prerecorded telemarketing calls. This is especially helpful for small business owners who are incentivized to answer all incoming calls because each call may be from a potential customer and are unable to ignore calls from unfamiliar numbers.  In addition, this requirement will help small businesses because it will provide legal certainty as to how callers and texters can demonstrate valid consent when that consent was obtained via a third party.

7.    The Commission acknowledges that the decision to make unequivocally clear that prior express written consent under the TCPA must be one-to-one consent may raise costs for some businesses, including those that fall under the definition of small businesses, in that direct consent between a consumer and a seller requires more labor and administration than a blanket authorization for affiliated companies to contact an individual.  However, the benefits of this policy, which accrue to millions of individuals and businesses, including small businesses, outweigh the costs to those businesses currently benefiting from multi-party "consent."  Over time, it may be possible for technological solutions to lower the costs to businesses for seeking one-to-one prior express written consent and maintaining consent records.  Any effort to create an exception for particular businesses, including small businesses, has the potential to undermine the effectiveness and intent of the policy, which is to provide consumers (including small businesses) the ability to determine when and how they are contacted in a transparent manner.

### D.    Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

8.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the rules and policies adopted herein.[5]    The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[7]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]

9.    *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[9]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[10]  These types of

---

[5] *Id.* § 604 (a)(4).

[6] 5 U.S.C. § 601(6).

[7] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[8] 15 U.S.C. § 632.

[9] *See* 5 U.S.C. § 601(3)-(6).

[10] *See* SBA, Office of Advocacy, "What's New With Small Business?,"https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf. (Mar. 2023)

small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[11]

10. Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[12] The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[13] Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[14]

11. Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[15] U.S. Census Bureau data from the 2017 Census of Governments[16] indicate there were 90,075 local governmental jurisdictions consisting of general purpose governments and special purpose governments in the United States.[17] Of this number, there were 36,931 general purpose governments (county,[18] municipal, and town or township[19]) with populations of less than 50,000 and 12,040 special purpose governments—independent school

---

[11] *Id.*

[12] *See* 5 U.S.C. § 601(4).

[13] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction. Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description. S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard. We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[14] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf. The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations. The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii. This data does not include information for Puerto Rico.

[15] *See* 5 U.S.C. § 601(5).

[16] 13 U.S.C. § 161. The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7". *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about html.

[17] U.S. Census Bureau, 2017 Census of Governments – Organization Table 2. Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments html. Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts). *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[18] *See id.* at tbl.5. County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments html. There were 2,105 county governments with populations less than 50,000. This category does not include subcounty (municipal and township) governments.

[19] *See id.* at tbl.6. Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html. There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

districts[20] with enrollment populations of less than 50,000.[21]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[22]

12.  *Wireless Telecommunications Carriers (except Satellite).*  This industry comprises establishments engaged in operating and maintaining switching and transmission facilities to provide communications via the airwaves.[23]  Establishments in this industry have spectrum licenses and provide services using that spectrum, such as cellular services, paging services, wireless Internet access, and wireless video services.[24]  The SBA size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[25]  U.S. Census Bureau data for 2017 show that there were 2,893 firms in this industry that operated for the entire year.[26]  Of that number, 2,837 firms employed fewer than 250 employees.[27]  Additionally, based on Commission data in the 2022 Universal Service Monitoring Report, as of December 31, 2021, there were 594 providers that reported they were engaged in the provision of wireless services.[28]  Of these providers, the Commission estimates that 511 providers have 1,500 or fewer employees.[29]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

13.  *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[30]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or

---

[20] *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State Census Years 1942 to 2017.

[21] While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[22] This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[23] *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[24] *Id.*

[25] 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[26] U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[27] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

[28] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2022), https://docs.fcc.gov/public/attachments/DOC-391070A1.pdf.

[29] *Id.*

[30] *See* U.S. Census Bureau, *2017 NAICS Definition*, "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[31]  Providers of Internet services (e.g., dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[32]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[33]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[34]  Of those firms, 1,039 had revenue of less than $25 million.[35]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

### E.    Description of Projected Reporting, Recordkeeping and Other Compliance Requirements for Small Entities

14.  The *Second Report and Order* includes new or modified reporting, recordkeeping, and compliance requirements for small and other entities.  This includes requiring terminating mobile wireless providers to block texts from a particular number or numbers following notification from the Commission.  Providers must promptly begin blocking the identified texts if illegal, and respond to the notice.  If the provider is unable to block further texts from that number because it has learned that the number has been reassigned the provider should promptly notify the Enforcement Bureau.  If the provider determines at a later date that the number has been reassigned, it should notify the Enforcement Bureau, and cease blocking.  Providers that fail to comply may be subject to enforcement penalties, including monetary forfeiture.

15.  The *Second Report and Order* also codifies that the National DNC Registry protections apply to text messages, and encourages mobile service providers to make email-to-text an opt-in service.  Additionally, it revises our definition of prior express written consent making clear that consent must be only to one single seller-caller to one single consumer at a time, and the seller must be logically and topically related to the content of the website on which consent is obtained.  Small entities may comply with the Telephone Consumer Protection Act (TCPA) and contact consumers by obtaining consent from the consumer to one seller at a time.  The Commission expects that small and other providers already taking significant measures to block illegal texts and will not find it burdensome to comply with these new obligations.  Any such burdens would be far outweighed by the benefits to consumers from blocking text messages that are highly likely to be illegal.

### F.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered

16.  The RFA requires an agency to provide, "a description of the steps the agency has taken to minimize the significant economic impact on small entities…including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the

---

[31] *Id.*

[32] *Id.*

[33] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[34] *See* U.S. Census Bureau, *2017 Economic Census of the United States, Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[35] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

**Federal Communications Commission**        **FCC 23-107**

other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."[36]

17. In the *Second Report and Order*, the Commission adopted text blocking rules modeled after the call blocking rules, but modified the new rules to account for the differences in the technology and delivery of text messages, and adopted requirements similar to those service providers were already familiar to reduce any additional burdens.[37] For example, a terminating provider will be required to block text messages only after it has received notice from the Commission's Enforcement Bureau. Second, text blockers are not required to block traffic "substantially similar" to the traffic the Enforcement Bureau identifies to avoid blocking on content analysis, which could lead to over blocking.[38] This modification will reduce concerns about liability for blocking incorrectly, as well as potential burdens if the Commission adopted a more expansive rule. While commenters suggested a blocking mandate is inappropriate because providers already take action to block text messages,[39] the Commission found commenters made general assertions, but offered no compelling evidence that they consistently block all traffic the Enforcement Bureau might identify.

18. In the *Second Report and Order*, the Commission also modified the prior express written consent requirement for TCPA consent to protect consumers while preserving the ability of comparison shopping websites to provide consumers with comparison shopping opportunities. This rule revision does not change the longstanding requirement that callers, including small businesses, must have consent from the called party, to comply with the TCPA. This modification makes it unequivocal that one-to-one consent is required under the Commission's TCPA consent rules. Such a requirement should not burden small entities that use lead generators to reach out to potential customers, because websites, including comparison shopping websites, can use a variety of means for collecting one-to-one consent for sellers to comply with the consent rule. For example, a website may offer a consumer a check box list that allows the consumer to specifically choose each individual seller that they wish to hear from or may offer the consumer a clickthrough link to a specific business so that the business itself may gather express written consent from the consumer directly. A website publisher could also reach out to a consumer for consent after the consumer has provided certain requested information and the site has subsequently selected a specific seller or sellers to contact the consumer.

19. The adopted modification does not prohibit comparison shopping websites from obtaining leads through valid consent and provides opportunities for such sites to obtain leads for potential callers (including small businesses) and texters. Further, this rule modification should help small businesses in reducing the number of unwanted and illegal calls and texts they receive, particularly if they cannot screen calls from unknown numbers. This rule modification best balances the needs of businesses, including small businesses, to utilize lead generation services to make calls to potential buyers with protecting consumers from a deluge of unwanted robocalls and robotexts. This will also help callers and texters, including small businesses, by providing legal certainty as to how to meet their burden of proof when they have obtained consent via a third party. Further, callers and texters may avail themselves of other options for providing comparison shopping information to consumers, e.g., manually dialed or non-prerecorded or artificial voice calls or texts, email, or information displayed directly on the third party website.

---

[36] 5 U.S.C. § 604(a)(6).

[37] *Second Report and Order* paras. 16-25.

[38] *Id.*

[39] *Id.*

60

**Federal Communications Commission**                                   **FCC 23-107**

### G.    Report to Congress

20.  The Commission will send a copy of the *Second Report and Order*, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act.[40]  In addition, the Commission will send a copy of the *Second Report and Order*, including this FRFA, to the Chief Counsel for Advocacy of the SBA.  The *Second Report and Order* and FRFA (or summaries thereof) will also be published in the Federal Register.[41]

---

[40] 5 U.S.C. § 801(a)(1)(A).

[41] *Id.* § 604(b).

**Federal Communications Commission**                    FCC 23-107

## APPENDIX E

### Initial Regulatory Flexibility Analysis

1.    As required by the Regulatory Flexibility Act of 1980, as amended (RFA)[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies proposed in this *Second Further Notice of Proposed Rulemaking* (*Second Further Notice*).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments in the *Second Further Notice* The Commission will send a copy of this entire *Second Further Notice*, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the *Second Further Notice* and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

#### A.    Need for, and Objectives of, the Proposed Rules

2.    In the *Second Further Notice*, the Commission proposes additional action to stop unwanted and illegal text messages that may harass and defraud consumers.  Specifically, the Commission proposes extending the call blocking requirements to require all downstream providers to block the texts from upstream providers that fail to block after Commission notification.  The Commission  also seeks comment on requiring providers to block texts based on content-neutral analytics, and on whether it is appropriate to adopt a 24-hour traceback response requirement for text messaging.  The *Second Further Notice* also requests comment on alternative approaches to protect consumers from unwanted texts, and any additional protections that may be necessary in case of erroneous blocking.  In addition, we seek comment on the viability of text authentication, and whether we should require industry updates on its feasibility.  Finally, the Commission proposes requiring providers to make email-to-text an opt-in service,.

#### B.    Legal Basis

3.    The proposed action is authorized pursuant to sections 4(i), 4(j), 227, 301, 303, 307, and 316 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 154(j), 227, 301, 303, 307, and 316.

#### C.    Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply

4.    The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small

---

[1] 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996)

[2] 5 U.S.C. § 603(a).

[3] *Id*.

[4] *Id.*§ 603(b)(3).

[5] *Id.* § 601(6).

[6] *Id.* § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public

(continued….)

business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

5.    *Small Businesses, Small Organizations, Small Governmental Jurisdictions.*  Our actions, over time, may affect small entities that are not easily categorized at present.  We therefore describe, at the outset, three broad groups of small entities that could be directly affected herein.[8]  First, while there are industry specific size standards for small businesses that are used in the regulatory flexibility analysis, according to data from the Small Business Administration's (SBA) Office of Advocacy, in general a small business is an independent business having fewer than 500 employees.[9]  These types of small businesses represent 99.9% of all businesses in the United States, which translates to 33.2 million businesses.[10]

6.    Next, the type of small entity described as a "small organization" is generally "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field."[11]  The Internal Revenue Service (IRS) uses a revenue benchmark of $50,000 or less to delineate its annual electronic filing requirements for small exempt organizations.[12]  Nationwide, for tax year 2020, there were approximately 447,689 small exempt organizations in the U.S. reporting revenues of $50,000 or less according to the registration and tax data for exempt organizations available from the IRS.[13]

7.    Finally, the small entity described as a "small governmental jurisdiction" is defined generally as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand."[14]  U.S. Census Bureau data from the 2017 Census of Governments[15] indicate there were 90,075 local governmental jurisdictions consisting of

---

comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

[8] *See* 5 U.S.C. § 601(3)-(6).

[9]  SBA, Office of Advocacy, "What's New With Small Business?," https://advocacy.sba.gov/wp-content/uploads/2023/03/Whats-New-Infographic-March-2023-508c.pdf. (Mar. 2023)

[10] *Id.*

[11] *See* 5 U.S.C. § 601(4).

[12] The IRS benchmark is similar to the population of less than 50,000 benchmark in 5 U.S.C § 601(5) that is used to define a small governmental jurisdiction.  Therefore, the IRS benchmark has been used to estimate the number of small organizations in this small entity description.  S*ee* Annual Electronic Filing Requirement for Small Exempt Organizations – Form 990-N (e-Postcard), "Who must file," https://www.irs.gov/charities-non-profits/annual-electronic-filing-requirement-for-small-exempt-organizations-form-990-n-e-postcard.  We note that the IRS data does not provide information on whether a small exempt organization is independently owned and operated or dominant in its field.

[13] *See* Exempt Organizations Business Master File Extract (EO BMF), "CSV Files by Region," https://www.irs.gov/charities-non-profits/exempt-organizations-business-master-file-extract-eo-bmf.  The IRS Exempt Organization Business Master File (EO BMF) Extract provides information on all registered tax-exempt/non-profit organizations.  The data utilized for purposes of this description was extracted from the IRS EO BMF data for businesses for the tax year 2020 with revenue less than or equal to $50,000 for Region 1-Northeast Area (58,577), Region 2-Mid-Atlantic and Great Lakes Areas (175,272), and Region 3-Gulf Coast and Pacific Coast Areas (213,840) that includes the continental U.S., Alaska, and Hawaii.  This data does not include information for Puerto Rico.

[14] *See* 5 U.S.C. § 601(5).

[15] 13 U.S.C. § 161.  The Census of Governments survey is conducted every five (5) years compiling data for years ending with "2" and "7".  *See also* Census of Governments, https://www.census.gov/programs-surveys/cog/about html.

**Federal Communications Commission**         FCC 23-107

general purpose governments and special purpose governments in the United States.[16]  Of this number, there were 36,931 general purpose governments (county,[17] municipal, and town or township[18]) with populations of less than 50,000 and 12,040 special purpose governments—independent school districts[19] with enrollment populations of less than 50,000.[20]  Accordingly, based on the 2017 U.S. Census of Governments data, we estimate that at least 48,971 entities fall into the category of "small governmental jurisdictions."[21]

8.    *Wireless Carriers and Service Providers.*  Wireless Telecommunications Carriers (*except* Satellite) is the closest industry with a SBA small business size standard applicable to these service providers.[22]  The SBA small business size standard for this industry classifies a business as small if it has 1,500 or fewer employees.[23]  U.S. Census Bureau data for 2017 show that there were 2,893 firms that operated in this industry for the entire year.[24]  Of this number, 2,837 firms employed fewer than 250 employees.[25]  Additionally, based on Commission data in the 2021 Universal Service Monitoring Report, as of December 31, 2020, there were 797 providers that reported they were engaged in the

---

[16]  U.S. Census Bureau, 2017 Census of Governments – Organization Table 2.  Local Governments by Type and State: 2017 [CG1700ORG02], https://www.census.gov/data/tables/2017/econ/gus/2017-governments html.  Local governmental jurisdictions are made up of general purpose governments (county, municipal and town or township) and special purpose governments (special districts and independent school districts).  *See also* tbl.2. CG1700ORG02 Table Notes Local Governments by Type and State_2017.

[17]  *See id.* at tbl.5.  County Governments by Population-Size Group and State: 2017 [CG1700ORG05], https://www.census.gov/data/tables/2017/econ/gus/2017-governments html.  There were 2,105 county governments with populations less than 50,000.  This category does not include subcounty (municipal and township) governments.

[18]  *See id.* at tbl.6.  Subcounty General-Purpose Governments by Population-Size Group and State: 2017 [CG1700ORG06], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 18,729 municipal and 16,097 town and township governments with populations less than 50,000.

[19]  *See id.* at tbl.10.  Elementary and Secondary School Systems by Enrollment-Size Group and State: 2017 [CG1700ORG10], https://www.census.gov/data/tables/2017/econ/gus/2017-governments.html.  There were 12,040 independent school districts with enrollment populations less than 50,000.  *See also* tbl.4.  Special-Purpose Local Governments by State Census Years 1942 to 2017 [CG1700ORG04], CG1700ORG04 Table Notes Special Purpose Local Governments by State_Census Years 1942 to 2017.

[20]  While the special purpose governments category also includes local special district governments, the 2017 Census of Governments data does not provide data aggregated based on population size for the special purpose governments category.  Therefore, only data from independent school districts is included in the special purpose governments category.

[21]  This total is derived from the sum of the number of general purpose governments (county, municipal and town or township) with populations of less than 50,000 (36,931) and the number of special purpose governments - independent school districts with enrollment populations of less than 50,000 (12,040), from the 2017 Census of Governments - Organizations tbls. 5, 6 & 10.

[22]  *See* U.S. Census Bureau, *2017 NAICS Definition, "517312 Wireless Telecommunications Carriers (except Satellite),"* https://www.census.gov/naics/?input=517312&year=2017&details=517312.

[23]  *See* 13 CFR § 121.201, NAICS Code 517312 (as of 10/1/22, NAICS Code 517112).

[24]  *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Employment Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEEMPFIRM, NAICS Code 517312, https://data.census.gov/cedsci/table?y=2017&n=517312&tid=ECNSIZE2017.EC1700SIZEEMPFIRM&hidePreview=false.

[25]  *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.

**Federal Communications Commission**                                    **FCC 23-107**

provision of wireless services.[26]  Of these providers, the Commission estimates that 715 providers have 1,500 or fewer employees.[27]  Consequently, using the SBA's small business size standard, most of these providers can be considered small entities.

9.  *All Other Telecommunications.*  This industry is comprised of establishments primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.[28]  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems.[29]  Providers of Internet services (e.g. dial-up ISPs) or Voice over Internet Protocol (VoIP) services, via client-supplied telecommunications connections are also included in this industry.[30]  The SBA small business size standard for this industry classifies firms with annual receipts of $35 million or less as small.[31]  U.S. Census Bureau data for 2017 show that there were 1,079 firms in this industry that operated for the entire year.[32]  Of those firms, 1,039 had revenue of less than $25 million.[33]  Based on this data, the Commission estimates that the majority of "All Other Telecommunications" firms can be considered small.

**D.**     **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities**

10.  The *Second Further Notice* includes proposals that may alter the Commission's current information collection, reporting, recordkeeping, or compliance requirements for small entities.  Specifically, the proposal to extend call blocking mandates to require all downstream providers to block the texts from upstream providers that fail to block after Commission notification, and requiring providers to block texts based on content-neutral analytics would create new obligations for small entities and other providers.  Similarly, establishing a 24-hour traceback response requirement for text messaging and requiring providers to make email-to-text an opt in service would also impose new compliance obligations on all providers, including small businesses.

11.  Additional blocking requirements, if adopted, such as requiring originating providers to block texts after notification from the Commission that the texts are likely to be illegal should not be a burden for small entities due to the fact that mobile wireless providers are currently blocking texts that are likely to be illegal.  We anticipate the information we receive relating to cost and benefit analyses will help the Commission identify and evaluate relevant compliance matters for small entities, including

---

[26] Federal-State Joint Board on Universal Service, Universal Service Monitoring Report at 26, Table 1.12 (2021), https://docs.fcc.gov/public/attachments/DOC-379181A1.pdf.

[27] *Id.*

[28] *See* U.S. Census Bureau, *2017 NAICS Definition,* "*517919 All Other Telecommunications,*" https://www.census.gov/naics/?input=517919&year=2017&details=517919.

[29] *Id.*

[30] *Id*.

[31] *See* 13 CFR § 121.201, NAICS Code 517919 (as of 10/1/22, NAICS Code 517810).

[32] *See* U.S. Census Bureau, *2017 Economic Census of the United States*, *Selected Sectors: Sales, Value of Shipments, or Revenue Size of Firms for the U.S.: 2017,* Table ID: EC1700SIZEREVFIRM, NAICS Code 517919, https://data.census.gov/cedsci/table?y=2017&n=517919&tid=ECNSIZE2017.EC1700SIZEREVFIRM&hidePreview=false.

[33] *Id.*  The available U.S. Census Bureau data does not provide a more precise estimate of the number of firms that meet the SBA size standard.  We also note that according to the U.S. Census Bureau glossary, the terms receipts and revenues are used interchangeably, *see* https://www.census.gov/glossary/#term_ReceiptsRevenueServices.

compliance costs and other burdens that may result from the proposals and inquiries we make in the *Second Further Notice*.

**E.      Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

12.  The RFA requires an agency to describe any significant, specifically small business, alternatives that it has considered in reaching its approach, which may include the following four alternatives, among others:  "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance, rather than design, standards; and (4) and exemption from coverage of the rule, or any part thereof, for such small entities."[34]

13.  In the *Second Further Notice* the Commission considered and seeks comment on several alternatives that may significantly impact small entities.  As we evaluate additional blocking requirements to protect consumers from illegal texts, we seek comment on how to define originating providers, and whether we should apply these rules to some other entity in the chain to better protect consumers.  We propose blocking messages based on their source, but consider alternatively whether they should be blocked on other criteria such as traffic that is "substantially similar" to blocked texts. In addition, we seek comment on alternatives to requiring providers to block texts based on content-neutral reasonable analytics.  We also request comment on alternatives to the proposed blocking or mitigation rules that would help to protect consumers from unwanted and illegal texts.  The Commission expects to fully consider whether any of the costs associated with the proposed text blocking requirements can be alleviated for small entities and any alternatives to minimize the economic impact for small entities following the review of comments filed in response to the *Second Further Notice*.

**F.      Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rules**

14.  None.

---

[34] 5 U.S.C. § 603(c)(1)–(4).

**Federal Communications Commission**                    **FCC 23-107**

## STATEMENT OF
## CHAIRWOMAN JESSICA ROSENWORCEL

Re:    *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

It's the holiday season. This is the time of year when we are ramping up our online shopping, donating to charities, and maybe, if we are lucky, planning for some downtime visiting with family and friends. But it is also a time when scammers are coming up with new schemes to cheat us through our phones. They know that sending us a message about a package we never ordered or a payment that never went through along with a link to a shady website is a quick and easy way to get us to fall prey to fraud. These messages make a mess out of our phones. But they do more than that; they erode trust in the networks we all count on to communicate.

We need to find every way we can under the law to stop these junk robocalls and robotexts from reaching us on our devices. And because scam artists are nimble—during the holidays and throughout the year—we need to regularly update our policies to stop this stuff from coming over the line.

The changes we make today matter. We make clear that when the Federal Communications Commission identifies a number sending this junk, carriers must block texts from that number before they reach your phone. Likewise, we make clear that the national registry to prevent unwanted calls applies not only to calls but also to texts.

Then we go one step further and shut down a loophole that is a significant source of a growing number of robocalls and robotexts. This loophole has been identified as a problem by countless consumer groups, members of Congress, and State Attorneys General because it creates a marketplace for our numbers, with companies buying and selling access to our phones and in the process cranking up the number of unwanted calls and texts we receive.

Let me explain.

Imagine you are shopping online. You give a business your number and in a single click you are also giving that business the right to sell and share your number with hundreds if not thousands of other businesses that may use it to send you robocalls and robotexts that you never asked for, do not want, and do not need. They bury it in the fine print, so you do not realize when you make that one click you are authorizing all kinds of incoming junk to your phone. This is called the lead generator loophole. And it is a big reason why unwanted robocalls and robotexts are multiplying on our phones. So today we put an end to this loophole. We make clear that any company that wants to use robocalls and robotexts in their businesses obtain consent one-to-one. That means consumers get back the power to pick who they want to communicate with and when.

Then, to make sure we can keep updating our efforts to stop unwanted calls and texts, we seek comment on some additional ideas we have to address them, including blocking through originating service providers, using authentication practices for texting, and requiring texting response to traceback requests.

I look forward to the record that develops. I look forward to putting an end to illegal robocalls and robotexts. We are not going to stop until we do.

**Federal Communications Commission** **FCC 23-107**

Thank you to those at the agency who worked on this effort, including Mark Stone, Aaron Garza, Wesley Platt, Kristi Thornton, Zac Champ, Jerusha Burnett, Mika Savir, Rebecca Maccaroni, Robert Aldrich, Kimberly Wild, and James Brown from the Consumer and Governmental Affairs Bureau; Kristi Thompson, Daniel Stepanicich, Caitlin Barbas, and Jane van Benten from the Enforcement Bureau; Jonathan Lechter, Connor Ferraro, Elizabeth Drogula, Adam Copeland, Jodie May, Melissa Droller Kirkel, Chris Laughlin, and Zachary Ross from the Wireline Competition Bureau; Kenneth Carlberg and David Furth from the Public Safety and Homeland Security Bureau; Kari Hicks, Susannah Larson, Jennifer Salhus, Barbara Esbin, Arpan Sura, Garnet Hanly, and John Lockwood from the Wireless Telecommunications Bureau; Joy Ragsdale, Joycelyn James, and Chana Wilkerson from the Office of Communications Business Opportunities; Michelle Schaefer, Patrick Brogan, Emily Talaga, Kim Makuch, Andrew Wise, Eugene Kiselev, Eric Ralph, and Mark Montano from the Office of Economics and Analytics; and Andrea Kearney, Rick Mallen, Derek Yeo, Jeffrey Steinberg, Kathleen Fulp, Anjali Singh, Michael Janson, Karen Schroeder, Douglas Klein, Marcus Maher, and Chin Yoo from the Office of General Counsel.

**Federal Communications Commission**                                           **FCC 23-107**

**STATEMENT OF**
**COMMISSIONER GEOFFREY STARKS**

Re:      *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

Combatting robocalls and robotexts is like whack-a-mole.  We shut down one scam, another arises.  We close one pathway for illegal and unwanted calls, fraudsters create another.  But this is no game, and the FCC has not backed down.

We are also adapting our tactics and adopting new ones.  That's what today's order does.  First, we impose additional text blocking requirements on providers, building on those we adopted in March of this year.  Second, we target the "lead generator loophole."  Consumers have a right to control who contacts them.  And just because you want to comparison shop doesn't mean you agree to provide a blanket consent to be robocalled and robotexted by strange, unrelated parties looking to prey.  And finally, we ask questions about what other steps we can take to stay ahead of scammers, including whether and how to impose certain parts of our robocall playbook – including traceback and authentication – onto our robotext efforts.  Here, as always, we will benefit from the knowledge and input of our industry and public interest partners.

Thank you to the FCC staff who worked on this item.  It has my support.

Federal Communications Commission                                    FCC 23-107

### STATEMENT OF COMMISSIONER NATHAN SIMINGTON, APPROVE, DISSENTING IN PART

Re:   *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls,* CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

I, like everyone in this building, and everyone on earth, hate receiving illegal and unwanted robotexts. I am pleased to approve every word of this item that does not relate to our approach to so-called "1-to-1 consent" for robotexts in the lead generation context. Unsurprisingly, the rest of the item is more-or-less well-trod regulatory territory that members of the Commission and staff are trained to understand.

However, as to our approach to 1-to-1 consent in the lead generation context, we are over our skis, and I dissent. I would have been pleased to support the approach, laid out in the NPRM, to constrain consumer consent to robotexting to only those entities "logically and topically related" to the predicate of the consumer inquiry. I voted for that because it made sense. That is: if I give consent to be robotexted about car insurance offers, I expect to receive texts about car insurance, not about garage doors—and, indeed, not even about car loans. Great. Makes sense. That proposal aligns typical consumer expectations around in what their consent to be robotexted consists, and it would eliminate the abusive practices contemplated in the NPRM.

I even supported asking about 1-to-1 consent in a further notice, because there is, possibly, a way to accomplish 1-to-1 consent that doesn't break the backs of American small business that rely on lead generation. Not probably, but at least possibly. We could have developed a fulsome record that actually contemplated that issue, instead of parachuting in an approach at the eleventh hour that caught American small businesses flat-footed and risks benefiting only the plaintiffs' bar. Unfortunately, by adopting 1-to-1 consent on a factually thin record, we today clumsily rush to save the American consumer from herself by sticking our finger in yet another new pie, vigorously stirring, calling the resulting mess a cobbler, insisting that it's healthier, and leaving the janitorial staff of brick-and-mortar, Main Street mortgage lenders, insurance brokers, real estate agents, and the like to clean up.

My colleagues worry that if we relax 1-to-1 consent, predatory lenders will rush into the regulatory gap left. Ah, yes. Predatory lenders, those conscientious respecters of regulation. If we regulate robotext consent hard enough, surely an offshore Cayman-funded organization with a call center in Belize relying principally on home-rolled SEO to dominate SERP visibility and using algorithmic approaches to beating Google's ad restrictions will be brought to heel. Give me a break. These people do not need to buy leads, and our action today does nothing to prevent their abusive behavior. At all. Nothing. It is another paper consumer victory for a Commission at least as interested in appearances as reality.

Speaking of appearances, the factual record on the question of 1-to-1 consent is so thin, and the Report and Order so impoverished in its reasoning supporting a rule upending the consumer financial products industry, that it gives every appearance of an arbitrary and capricious action by the Commission. But listen, I'm not the only one with concerns. Don't take the word of the Republican minority Commissioner. It is easy for me to take pot shots.

Consider instead the word of the Small Business Administration, who admonished the Commission to rethink today's Report and Order and to further consider our approach to 1-to-1 consent. The SBA's Office of Advocacy indicated not just that the small businesses of America are deeply concerned by today's action, but that it may indeed formally fail regulatory flexibility analysis in that it fails to account for the impact this action will have on small American businesses. Quite so, and no amount of last-second wordsmithing can rehabilitate a requirement this ill-considered and unsupported.

70

**Federal Communications Commission**                    **FCC 23-107**

Again, as to the rest of the item, I approve.  But as to this narrow issue, that easily could have been fixed by a further notice, I strongly dissent.

**Federal Communications Commission**      FCC 23-107

# STATEMENT OF
## COMMISSIONER ANNA GOMEZ

Re:      *Targeting and Eliminating Unlawful Text Messages,* CG Docket No. 21-402; *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278; *Advanced Methods to Target and Eliminate Unlawful Robocalls,* CG Docket No. 17-59, Second Report and Order, Second Further Notice of Proposed Rulemaking, and Waiver Order (December 13, 2023)

Choosing the right product or service in a thriving competitive market with a sea of options can be an overwhelming task.  That is why consumers turn to comparison shopping websites.  To make the process of choosing the right product or service – be it a loan, medical insurance, or real estate – easier, and less overwhelming.  But when what seemed like a solution to staying afloat in a sea of too many choices turns into a tsunami of unwanted robocalls and robotexts, it is our job to step in to help.

The Order we adopt today makes clear that businesses interested in robocalling and robotexting consumers will need to receive specific consent from a consumer in order to send those types of communications.  Importantly, this decision does not foreclose other marketing options.

In considering this item, I thought deeply about its effect on small businesses.  The sea of product and service options can also be challenging for small businesses to navigate from a marketing perspective, because they face larger competitors for consumer attention.  That is why small businesses turn to lead generators, to get leads on potential customers.  I pay close attention when our rules impact small businesses.  And, in this instance, they continue to have various options to work with lead generators. First, as long as a consumer provides prior express written consent to receiving marketing through robocalls or robotexts, a small business can still use leads obtained through lead generators to make robocalls and robotexts.  And small businesses will continue to be able to contact customer leads via non-autodialed calls and non-autodialed texts—provided the customers are not on the Do Not Call List, email, and even mail.

While this Order alters the way some lead generator websites have operated, we believe that reducing the harm to consumers resulting from a tsunami of robotexts and robocalls to which they did not consent outweighs the discomfort of the change we adopt in this Order.

I want to thank the Office of the Chairwoman for accepting our edits to this item incorporating concerns from the small business community and highlighting the marketing options that remain available for small businesses. Also for directing the Consumer and Governmental Affairs Bureau to conduct outreach and provide education focusing on compliance to small business lead generators and small business lead buyers.  And thank you to the Bureau for your hard work on this important item.  I approve.